IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ENDURE INDUSTRIES, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Cause no. 3:20-CV-3190 |
| v. | § | |
| | § | |
| Vizient, Inc., a Delaware corporation, | § | |
| Vizient Supply, LLC, a Delaware limited | § | |
| liability company, Vizient Source, LLC, | § | |
| a Delaware limited liability company, | § | |
| Novation, LLC, a Delaware limited liability | § | |
| company and Novation Ventures, LLC, a | § | |
| Delaware limited liability company, | § | |
| Provista, Inc., a Delaware corporation, | § | Jury Demand |
| | § | |
| Defendants. | § | |

## COMPLAINT

Pursuant to Sherman Act §§1 and 2 (15 U.S.C. §§1and 2) and Clayton Act §§3, 8 and 16 (15 U.S.C. §§14, 19 and 26), Plaintiff Endure Industries, Inc. ("Endure"), by its undersigned attorney, files this Complaint against Vizient, Inc., Vizient Supply, LLC, Vizient Source, LLC, Novation, LLC, Novation Ventures, LLC and Provista, Inc. (collectively and alternatively, "Vizient"). Endure seeks Declaratory Relief pursuant to 28 U.S.C. §2201 and Injunctive Relief pursuant to 15 U.S.C. §26.

## NATURE OF THE ACTION

1. This antitrust case involves Defendants' unlawful restraint of trade and exclusionary conduct in the market for manufacture, sale, and distribution of medical

1

disposable products to Vizient Member hospital patients throughout the United States. The Vizient Member hospitals are initial purchasers who pass through the cost of each item to consumer patients in itemized patient bills.

2.  Vizient is a dominant supplier of medical disposable products in horizontal competition with Endure, both as a GPO and as a manufacturer of medical disposable products under the NovaPlus label.

3.  This antitrust case involves restraint of trade by Vizient's manufacture, sale, and distribution of medical disposable products in horizontal competition with Endure using a Group Purchasing Organization framework to deny access to Endure and other competitors.

4. This antitrust case also involves restraint of trade in the manufacture, sale and distribution of medical disposable products in horizontal competition with Endure under a scheme by which Defendants' competing product brand, NovaPlus, is not subject to the same market restraints imposed on Endure and other competitors by Vizient's Group Purchasing Organization ("GPO") entities.

5.  Vizient has excluded competitors and harmed competition through a set of interrelated policies and practices:

a.  Vizient denies access by suppliers to consumers who purchase medical disposable products through hospitals unless the supplier agrees through

Vizient's required Product Supplier Agreement to participate in the Impact Standardization Program.

b. Vizient employs a bidding process to exclude all but one supplier in each product category.

c.  Participating hospitals must pay for supplies within the ISP to avoid a penalty in the form of lost supplier rebates ("Non-compliance Penalty"). The supplier rebates are calculated as part of each chosen supplier's bid price.

d.  To avoid the Non-compliance Penalty, compliant hospitals are forced to pay a "Double-payment Penalty" under contract terms which require them to pay for both the Vizient product plus the competitor's product if the compliant hospital chooses the competitor's product. Member hospitals are thus effectively penalized for, or prevented from, opting out of the ISP to choose competitor's product.

e.  Vizient employs a staggered termination date strategy whereby each product category within the ISP has a different termination date, assessing penalties to Member hospitals which end the relationship or choose a different supplier.

6.   Vizient awards access to an exclusive bidder for each product category included in its ISP. This exclusive supply arrangement denies competing suppliers the ability to compete in the relevant market.

7.   Vizient's "no ISP-no access" policy dramatically increases prices paid by the consumer-patients who purchase the disposable medical products through consumer-hospitals. Each consumer-patient admitted to a consumer-hospital is directly charged for each medical disposable product used in the patient's care; the patient has no choice of product used and must pay the price charged by Vizient to the hospital.

8.   Vizient's refusal to allow access by competitors to Vizient's supply directory, through which Vizient sells NovaPlus and select products chosen through the ISP bidding process bolsters Vizient's ability to maintain elevated prices and to diminish competition.

9.   Similarly, Vizient's refusal to allow access by competitors to Vizient's Impact Standardization Program, through which Vizient sells select product brands chosen through a bidding process strengthens Vizient's ability to maintain elevated prices and to diminish competition.

10.   By requiring participating hospitals to pay the ISP price even if the hospital chooses a non-Vizient-authorized product, Vizient in effect imposes a penalty in two forms: 1) the Double Payment Penalty is imposed when a compliant hospital chooses a nonVizient-authorized product because the hospital must also purchase the Vizient-

authorized product to maintain compliance with regard to unrelated products and 2) the Noncompliance Penalty is imposed when a noncompliant hospital purchases a nonVizient-authorized product because the supplier rebate is lost. Member hospital "compliance" with the ISP is defined under the terms of the ISP as meeting a set percentage volume purchase potential agreed between the hospital and the ISP supplier chosen by Vizient ("chosen supplier") for each product category.

11.  Vizient's conduct has harmed competition and the competitive process and threatens further consumer harm.

## PARTIES

12.  Plaintiff Endure Industries, Inc. is a New York corporation headquartered at 45 N. Fulton Street, Homer, New York 13007.

13.  Defendant Vizient, Inc. is a Delaware corporation headquartered at 290 E. John Carpenter Freeway, Irving, Texas 75062. Vizient, Inc. may be served with process at CT Corporation, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

14.  Defendant Vizient Supply, LLC is a Delaware corporation located at 290 E. John Carpenter Freeway, Irving, Texas 75062. Vizient Supply LLC may be served with process at CT Corporation, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136. Vizient Supply, Inc. is a member of Vizient Source, LLC.

15.  Defendant Vizient Source, LLC is a Delaware corporate located at 290 E. John Carpenter Freeway, Irving, Texas 75062. Vizient Source, LLC may be served with process at CT Corporation, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

16.  Vizient Supply, LLC operates under the assumed name Novation, LLC. Defendant Novation, LLC is located at 290 E. John Carpenter Freeway, Irving, Texas 75062. Novation, LLC may be served with process through Vizient Supply, LLC at CT Corporation, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

17.  Defendant Novation Ventures, LLC is Delaware corporation, with an unknown location. The Texas Secretary of State lists Novation Ventures, LLC as a fictitious name for Vizient Supply, LLC. Novation Ventures, LLC, is in good standing with the Delaware Secretary of State, and on information and belief, Novation Ventures, LLC may be served with process through Vizient Supply, LLC at CT Corporation, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

18.  Provista, Inc. is a Delaware corporation. Its corporate headquarters are located at 250 E. John Carpenter Frwy., Irving, Texas 75062. It may be served with process as Provista Supply Chain Solutions, Inc., at CT Corporation, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

19.  The Court has subject matter jurisdiction over Endure's antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. §26, and 28 U.S.C. §§1331 and 1337. The

Court has supplemental jurisdiction over Endure's state law claims pursuant to 28 U.S.C. §1332 based on diversity of citizenship of Endure, a New York corporation headquartered in New York, and all Defendants, who are Delaware Corporations headquartered in Texas. Although Endure does not seek monetary damages, the amount in controversy exceeds $75,000.

20.  This Court has personal jurisdiction over each Defendant. Each Defendant is headquartered in this District. Also, each Defendant has engaged in sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both United States and Texas law such that the exercise of jurisdiction over each Defendant would comport with due process requirements.

21.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Vizient maintains its principle place of business in the State of Texas and in this District, and because a substantial part of the events or omissions giving rise to Endure's claims occurred in this District. In the alternative, personal jurisdiction and venue may be deemed proper under Section 12 of the Clayton Act, 15 U.S.C. §22, because Vizient may be found in or transacts business in this District.

## FACTS

22. For any facts set forth herein about which Plaintiff does not have first-hand knowledge, allegations are made on information and belief.

*A. Endure has capacity to supply to the hospital market.*

7

23. Plaintiff Endure Industries, Inc. ("Endure") is an accredited woman-owned enterprise, incorporated in 2016 by a practicing physician. Endure opened for business in 2017 with the innovative goal of radical price transparency to provide lower costs to providers and patients.

24. Endure manufactures and distributes "medical disposable" products, which constitute the least technically complex subset of all devices sold in the medical supply market. In other words, there is a high degree of interchangeability. Medical disposable products also account for one of the highest-volume sectors in the field.

25. One of the foundational tenets of Endure Industries is a commitment to radical transparency in pricing that has been relatively non-existent in the healthcare sourcing landscape. With greater transparency comes lower costs and greater predictability of savings for consumers and their patients.

26. What makes the company unique, is its ability to deliver affordable prices to clients by streamlining the medical device production and delivery process. Endure utilizes data-driven optimization and technological automation to fine-tune every step along the sourcing pipeline—including operational logistics, inventory management and distribution.

27. Studies show that at least 1000 Endure products that are sold at the most common hospital-requested unit of measure, are 10-50% more affordable than the lowest prices offered by Vizient and other leading GPO's.

28.  Endure has conducted rigorous advertising campaigns and other marketing endeavors. However, due to Vizient's closed Network of hospitals and the ISP, Vizient has closed the medical disposable product market to Endure and all other suppliers except Vizient, the ISP-chosen supplier and NovaPlus.

*B. The purpose served by GPOs has changed.*

29.  Group Purchasing Organizations came into prominence in the United States during the last two decades of the Twentieth Century, with the advent of the 1990s' prospective payment system for inpatient hospital reimbursement and the rise of managed care organizations.

30.  During that time, fee-for-service reimbursement was called into question. Because many corporations at that time saw it as a cost advantage to insure employees through health maintenance organizations, providers and hospitals began to form groups. The purpose of the groups at that time was to employ economies of scale by 1) assisting providers in negotiating insurance contracts with group providers and 2) helping hospitals approach supply manufacturers with volume purchases.

31.  The early purpose of the GPO was to save operating costs related to procurement by allowing a centralized organization to accept a 3% fee in exchange for managing supply chain issues. Hospitals also sought to reduce supply costs with the goal of meeting the new cost-saving demands of managed care programs.

32.  Questions arose in the early part of this century when some studies showed that prices charged to hospitals through GPO's were higher than hospitals could negotiate independently.

33.  Today, all hospitals are members of at least one GPO.

34. GPO's have become independent entities which neither benefit the hospital nor the supplier. GPO's have become large machines which serve their own profit motive by encouraging and in some respects requiring hospital participation and by preventing supplier sales outside the limited context of the GPO.

35. Hospitals have had limited practical alternatives to the medical disposable products offered by Vizient, in particular, and GPOs, in general.

36. Patients, who purchase the medical disposable products through hospitals, have no choice among any alternative medical disposable products.

37.  GPO's have departed from the original goal of price efficiency.

   *C. The relevant market is US medical disposable product sales to hospitals and hospital patients.*

38.  The relevant geographic market is the United States of America.

39. The relevant markets for the purposes of assessing Vizient's monopoly power and market power are no broader than that nation-wide hospital and hospital patient market for manufacture, sale and/or distribution of 1) disposable medical supplies; 2) medical tapes; and 3) medical tourniquets.

   *D. Vizient has power to impact competition in a market with few participants.*

10

40.  Currently, the medical disposable product sector is dominated by Group Purchasing Organizations (GPO's). Four of the GPO's account for over 90% of hospital-based sales. Vizient is the largest of those four GPO's. Vizient controls more than 50% of all medical device sales made to hospitals.

41.  Vizient is actively increasing its market share by 1) acquiring smaller GPOs and 2) by contracting with vendors to sell under Vizient's private label—Novaplus. In recent years, Vizient has merged with Novation and MedAssets.

42.  When the Novaplus market share is considered with Vizient's GPO market share, the number substantially exceeds 50%.

43. Vizient is a horizontal competitor of Endure because it sells and distributes medical disposable products to hospitals through its ISP program and otherwise. Vizient is the primary source through which Member hospitals purchase the products.

44. Additional competing GPO's in the relevant market are Premier, Health Trust and Intalare.

45.  Vizient is also a horizontal competitor through its NovaPlus label.

46. Applying to GPOs is a lengthy process and takes significant manpower. Each failed attempt amounts to weeks of lost hours and expenses.

47.  Endure was accepted as a participant to bid for inclusion in the Vizient ISP tapes category of the Patient Care Program; the bid was not awarded to Endure.

48. Endure also applied to Vizient to participate in the bid for participation in the

category which includes tourniquets and was denied access to the bidding process.

49. Endure has applied to the other major and many smaller GPO's and has been denied access to their Hospital Members.

50. Endure's competitor in the medical tape market to hospitals is a major manufacturer. Endure does not know whether NovaPlus is a tape competitor.

51.  Until last year, Vizient contracted with ASP Global to supply tourniquets. This year, Vizient ended its contract with ASP Global and awarded the contract to Platinum Code, which agreed to make tourniquets under Vizient's NovaPlus brand.

52. Endure applied for inclusion in the Vizient Network and was rejected. Since Vizient discloses that 95-98% of Network suppliers participate in the ISP, suppliers not chosen by Vizient to participate in the ISP are generally excluded from the Vizient Network.

> *E. Vizient has power to impact competition because barriers to entry are high in the hospital market.*

53. The hospital market for medical disposable products is distinct from other medical-surgical supply buyers. Hospitals demand a higher volume of product, a broader product mix and a higher level of vendor service than do other customers.

54. Supply to hospitals differs from supply to other health care institutions. Hospital supply is a low-margin, high-volume business. Trade to other non-hospital customers is a higher-margin, smaller scale business.

55. While hospital supply companies can service smaller, non-hospital clients, the reverse is not true. This is a consequence of the hospital's unusual demand requirement. Any transition from the physician supply business to the hospital supply business is difficult and requires increased warehouse space and computer capabilities and large capital investments to expand inventory and delivery capabilities.

56. Endure has the capacity to meet hospital supply requirements across all medical disposable product lines.

### F. Vizient sales and distribution.

57.  Vizient promises the opportunity to award a contract to a Supplier under which Vizient will include the Supplier on its database as an Authorized Distributor.

58.  Vizient represents that it is engaged in "providing purchasing opportunities with respect to high quality products and services to individual entities and groups of entities designated by Vizient to purchase under its contracts."

59.  Each entity or group of entities designated by Vizient is a Member.

60.  Vizient, together with the Clients (Vizient Inc. and Provista), provide to each Member a copy of the Product Supplier Agreement of suppliers to whom a contract is awarded ("chosen supplier"). Vizient provides the information to Members at meetings and conferences and to invite the chosen Suppliers to participate in meetings and other activities with Members. Vizient provides chosen supplier product samples to Members and lists the Supplier's product in Vizient's online catalogue.

61.  Vizient charges an administrative fee of 3-4% of Net Sales of products sold directly to Members by the chosen supplier.

*G. Supplier access.*

62.  Each product vendor who seeks access to the medical disposable product sales and distribution market to Vizient Member hospitals must sign a Product Supplier Agreement ("PSA") for each product the vendor wishes to sell. Endure signed a Product Supplier Agreement on or about September 16, 2019. Vizient did not sign the agreement and denied Endure's request to participate as a supplier under the PSA.

63.  The PSA online supplier signature is a pre-condition to electronically file a Request for Proposal. Endure submitted its Request for Proposal for tapes electronically on or before September 20, 2020. The RFP provided a list of 6 types of tape together with specifications and pricing. Endure provided samples of its tapes on or before September 20, 2019.

64. After several steps in the process toward acceptance in the tape portion of the ISP, Endure's bid was rejected.

65. Endure was excluded from the tape market to Member hospitals.

66. Endure applied for consideration in the tourniquet category. Vizient did not invite Endure to submit an RFP for participation in the tourniquet category. Endure was excluded from the tourniquet market.

67. Vizient further denied access to Endure for participation as a Network provider.

68. Thus Vizient completely foreclosed Endure from access to Vizient's share of the hospital market for medical disposable products.

69. Endure was denied access to the other four leading GPOs as well.

70. No hospitals purchase medical disposable products from Endure.

H. "No ISP—No Access"

71. Vizient conditions supplier access to Vizient's portion of the hospital market for medical disposable products on supplier acceptance of terms of a program called Impact Standardization (ISP) under which bundles of unrelated products are sold and distributed to Vizient Member hospitals.

72. Vizient discloses that 95-98% of Vizient suppliers participate in the ISP.

73. The Vizient policy imposes a bidding process that largely ignores price as a factor in favor of other vague and undefined factors.

74. The bundling program forces Member hospitals to purchase "all or nothing" from the Vizient's chosen supplier for each product.

75. Thirteen Programs cover all types of medical disposable products.

76. Each Program has multiple related and unrelated products, called Categories.

77.  A Member chooses one supplier for each Category of products. A Member hospital loses rebates when it switches from one supplier to another even within the program (Non-compliance Penalty).

78.  The ISP results in increased prices that hospitals and consumers must pay on Vizient-based products.

79. Without the "no ISP-no access" policy, Member hospitals would have the ability and incentive to challenge Vizient's pricing demands by purchasing lower-cost products.

80.  Vizient states that 80% of Vizient hospitals participate in the ISP but does not state that the other 20% do not so participate. Since 95-98% of Vizient suppliers participate in the ISP, the hospital and supplier percentages reflect a foreclosed market.

*I. Program terms define "compliance."*

81.  Under the PSA, each applicant supplier is required to participate in the Impact Standardization Program, under which the Supplier pays rebates through Vizient to Members who meet the purchase volume compliance standards.

82.  The Program is employed by Vizient through Net Sales reports provided by the Supplier. Vizient determines whether a Member qualifies for rebates. Compliant Members are eligible for rebates on Net Sales of all Products in Categories sold by chosen Suppliers.

83. The industry standard rebate is 3-6%.

84.  Compliance is based on potential purchase volume agreed by a chosen supplier and a Member.

85.  Each Member is asked to participate in all the Program Categories, other than one "Opt-Out" category.

86.  A Member hospital is not eligible for access to any ISP rebates until it reaches an aggregate Program compliance level of 75% across all 13 Programs. If the 75% requirement is met, additional conditions apply.

87.  No Rebates are paid until further compliance of 90% is reached within each individual product category.

88.  The ISP requires a sole Supplier for each product category to encourage Member "standardization" within a product category.

> J. Vizient's "no ISP-no access" policy compels hospitals to accept Vizient's ISP terms.

89.  Vizient's "no ISP-no access" policy has significantly influenced hospital participation in the Vizient ISP and in prices paid by hospitals and patients in the relevant market.

90.  To obtain access to Vizient's listed products and hoped-for cost savings (rebates), Member hospitals accept Group Purchasing Organization terms which do not reflect product quality and price as primary factors; the terms do not consider economies of scale and other market efficiencies.

91.  Instead, the prices consumers pay through hospitals for medical disposable products reflect Vizient's dominant position in the market and Vizient's ability to exclude competitors.

92.  The prices include an added increment which compliant Member hospitals pay to avoid penalties in the form of a required payment for in-program products even if out-of-program products are chosen (Double-payment Penalty). Even the single allowed opt-out product imposes a penalty because the hospital must meet the minimum required 90% purchases within the Category of products from which the opt-out product is chosen in order to qualify for supplier rebates in all of the other Categories within the Program. If non-compliant, Members pay prices for the products, which factor in the promised rebates, without the rebates, imposing a Non-compliance Penalty.

*K. Staggered terms.*

93.  Vizient employs a staggered termination date strategy, under which a Member's and/or Supplier's termination date for each product Category within a Program differs.

94.  The term of the PSA is generally three years and automatically renews for two years for each product category.

95.  Each of the multiple programs within the Impact Standardization Program has a different beginning and ending date. Similarly, a contract awarded under each category within each program begins and ends on a distinct date.

96.  The staggered termination date terms make exit from the Impact Standardization Program nearly impossible. Because 75% compliance in all categories allows a Member access to rebates based on 90% compliance within a program, any departure from the Impact Standardization Program will cause substantial loss of rebates in all other programs until those programs and categories terminate. Thus, if a Member wants to change GPO's or suppliers it must allow each Program to terminate, losing price-significant discounts on all other products until the last program terminates.

*L. Penalties for non-compliance.*

97. The supplier selection process imposed by Vizient under the ISP which does not consider price and product quality as substantial factors, the rebates required of suppliers which are incorporated into each bid price and the penalties for hospital "non-compliance" with the Program, increase prices paid by consumers, reduce demand for competitors' products, reduce ability and incentive for competitors to invest and innovate.

98.  If Vizient used its market dominance solely to raise the nominal prices of its own NovaPlus product, those price increases would spur hospitals to seek substitutes and would attract entry and competitive pricing from competitors.

99.  By contract, imposing a penalty—which compliant hospitals must pay regardless of whether they use the Vizient-offered program product or a product supplied by a Vizient competitor—enables Vizient to raise the all-in prices of medical disposable products without spurring substitution or attracting entry.

100.  Vizient actively hinders substitution and prevents entry.

*M. Vizient's agreements with the chosen ISP suppliers foreclosed a substantial portion of competition in the relevant market.*

101.  The participants in the ISP agreement are Vizient, Member hospitals and the chosen supplier in each product category.

102.  The ISP agreement provides two types of bundles: Programs and Categories.

103.  Each of the thirteen Programs includes 5 to 12 Categories. Each Category includes several products.

104.  Vizient's ISP agreement requires participating suppliers to pay rebates to Member hospitals based on percentage of net sales to Member hospitals.  Discounts apply to purchases within each bundle.

105.  Penalties apply for hospital non-compliance with purchasing requirements imposed at two levels: 1) within the program and 2) within the category.

106.  The conditional rebates essentially penalize the Member hospital's use of any product supplied by a competitor of Vizient, Novaplus or the Vizient-chosen supplier.

107.  Vizient's agreement with the Vizient-chosen supplier under the ISP works as a *de facto* exclusive deal that is effective as an express purchase requirements contract.

108.  The agreement effectively foreclosed Endure, Vizient GPO competitors and tape supplier competitors from supplying tape products to Vizient Member hospitals and associated tape consumers.

109.  Market foreclosure exceeded 40%.

110.  Alternatively, under a price-cost test, the penalties under the ISP agreements, discounts provided by Novaplus,  and other incentives paid to participants are sufficiently large that, if they were attributed as discounts to the price of Vizient's offered tape products, the resulting price of the Vizient-authorized tape through the ISP would be below Vizient's (and/or its chosen supplier's) cost.

111.  Vizient's exclusive deal with its chosen tourniquet supplier under the ISP excluded competition from other tourniquet suppliers and harmed competition.

112.  The agreement effectively foreclosed Endure, Vizient GPO competitors and tourniquet supplier competitors from supplying tourniquet products to Vizient Member hospitals and associated tourniquet consumers.

113.  Market foreclosure exceeded 40%.

114.  Alternatively, under a price-cost test, the penalties under the ISP agreements, discounts provided by Novaplus, and other incentives paid to participants are sufficiently large that, if they were attributed as discounts to the price of Vizient's offered tourniquet products, the resulting price of the Vizient-authorized tourniquets through the ISP would be below Vizient's (and/or its chosen supplier's) cost.

115.  Vizient's exclusive deal with each chosen medical disposable product supplier under the ISP excluded competition from other medical disposable product suppliers and harmed competition.

116.  The agreement effectively foreclosed Endure, Vizient GPO competitors and medical disposable product supplier competitors from supplying medical disposable products to Vizient Member hospitals and associated medical disposable product consumers.

117.  Market foreclosure exceeded 40%.

118.  Alternatively, under a price-cost test, the penalties under the ISP agreements, discounts provided by Novaplus,  and other incentives paid to participants are sufficiently large that, if they were attributed as discounts to the price of Vizient's offered medical disposable products, the resulting price of the Vizient-authorized medical disposable products through the ISP would be below Vizient's (and/or its chosen supplier's) cost.

119.  Vizient's exclusive deal with each chosen medical disposable product supplier under the ISP excluded competition from other medical disposable product suppliers and harmed competition.

120.  The ISP agreement is an unreasonable restraint of trade.

*N. Harm to competition caused by Vizient's practices.*

121.  Vizient's anticompetitive conduct has relaxed the constraints that competitors' entry and expansion would otherwise impose on product choice and all-in prices in the medical disposable product market, including the medical tape and medical tourniquet markets.

122.  By impairing Member hospitals' freedom of choice for competitors' medical disposable products through imposition of penalties, Vizient's conduct has also diminished Member hospitals' demand for those products, reduced competitors' sales and margins, and diminished competitors' ability and incentive to invest and innovate.

123.  Vizient is entitled to compensation for its sale and distribution of products to Member hospitals. In Vizient's case, compensation takes the form of a fee of 3-4% of gross sales to be paid by the supplier. This payment is incorporated into the price bid by the supplier for ISP access and paid directly by consumers through Member hospitals.

124.  The Vizient-chosen supplier under the ISP in this case, who is also a horizontal competitor to Endure, is paid a price bid under the ISP minus rebates required under the program.

125.  Vizient's anticompetitive conduct, however, gives little regard to price considerations in making its sales decisions, charging inflated prices through use of Vizient's market power. Absent Vizient's conduct, medical disposable products would be sold to consumers through Member hospitals under fair, reasonable, and equitable terms and would not include elevated prices that penalize Vizient competitors.

126.  Absent Vizient's unlawful conduct, Vizient could obtain fair compensation for its administrative, sales and distribution efforts while its competitors could compete based on the merits of their respective offerings.

127.  Vizient's practices have harmed competition and consumers within the markets for medical disposable products. These markets include medical tape and tourniquets.

128.  Vizient's practices are not reasonably necessary to accomplish any significant procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and Vizient reasonably could achieve any procompetitive goals through less restrictive alternatives.

129.  Developments in the industry reflect the natural consequences of Vizient's conduct.

130.  Few companies can muster the capital, focus the manpower and endure the application time delays necessary to compete to supply goods to hospitals. There are few competitors, and the fate of unsuccessful competitors is not yet known.

131.  If Vizient's remaining competitors were to exit the business because of Vizient's anticompetitive conduct, this would have a significant adverse impact on competition in disposable medical product markets and on innovation.

132.  Competition often drives firms to innovate in next-generation methods. Enhanced innovation in the medical disposable product market largely include efficiencies in production and development that lead to cost savings. By suppressing innovation, Vizient's anticompetitive practices threaten these benefits.

133.  Vizient had no reasonable justification for its conduct.

134.  Endure was damaged monetarily as a proximate result of Vizient's conduct.

135.  As a direct and proximate result of Vizient's wrongful conduct, Endure was required to retain counsel and incurred reasonable and necessary attorneys' fees and costs.

## COUNT I
### Exclusive Dealing Pursuant to
### *Tampa Elec. Co. v. Nashville Coal Co.,*
### 365 U.S. 320 (1961)
### Clayton Act (15 U.S.C. §14)
### Sherman Act (15 U.S.C. §1)

136. Endure incorporates paragraphs 1 through 135 as if fully sets forth as part of Count I.

137.  Vizient is a seller in the relevant market by virtue of its GPO and Novaplus.

138.  Vizient employed bundled discounts which excluded competition.

139.  At least one Vizient contract provides that a Member hospital must deal exclusively with a chosen supplier for medical tape also sold by Endure.

140.  Alternatively, at least one Vizient contract provides that a Member hospital must deal exclusively with a chosen supplier for tourniquets also sold by Endure.

141. Alternatively, at least one Vizient contract provides that a Member hospital must deal exclusively with a chosen supplier for each medical disposable product also offered for sale by Endure.

142.  It is probable that performance of any or each of the contracts described in paragraphs 137 to 141 will foreclose competition in each line of commerce affected.

143.  The foreclosed market share in each or every relevant product line is substantial.

144.  Vizient has market power in each relevant market based on its strength relative to Endure, the percentage of volume of commerce involved in relation to total commerce in the market and the probable immediate and future effects that each contract may have on competition in the market.

**COUNT II**
**Exclusive Dealing pursuant to**
***Brooke Group Ltd. v. Brown & Williamson,***
**509 U.S. 209 (1993)**
**Sherman Act, 15 U.S.C. §2)**

145. Endure incorporates paragraphs 1 through 135 as if fully sets forth as part of Count II.

146.  Vizient is a seller in the relevant market by virtue of its GPO and Novaplus.

147.  Vizient employed bundled discounts which excluded competition.

148. Vizient has market power in each relevant market based on its strength relative to Endure, the percentage of volume of commerce involved in relation to total commerce in the market and the probable immediate and future effects that each contract may have on competition in the market.

149.  To any extent price was the predominate factor involved in Vizient's exclusionary conduct, after allocating the discount given by Vizient, Novaplus and the chosen supplier on the entire bundle of products to each competitive product or products, Vizient, Novaplus and the chosen supplier sold the competitive product or products below its average variable cost of producing them.

150. The market was made less competitive due to Vizient's pricing conduct.

## COUNT III
### Refusal to Deal
### Sherman Act (15 U.S.C. §1, 2)

151.  Endure incorporates paragraphs 1 through 135 as if fully set forth as part of this Count III.

152.  Vizient can control a price within its relevant product market or its geographic market or to exclude Endure from doing business within its relevant product market or geographic market.

153. Vizient is a horizontal competitor of Endure by virtue of its role in the manufacture, sale, and distribution of medical disposable products, including tape and tourniquets through the Vizient GPO and through Novaplus.

154. Vizient controls and maintains a facility in the form of a GPO which includes numerous Member hospitals and Network suppliers.

155. The facility is essential.

156. Vizient has the type of control over the facility that is forbidden by the Sherman Act.

157. Duplication of the facility by Endure is unreasonable or impractical.

158. Vizient denied Endure the use of the facility.

159. Providing access to Endure was feasible.

160. Alternatively, Vizient unilaterally turned down more profitable dealings with Endure to drive Endure's exit or to disable its ability to compete, thereby allowing Vizient to recoup its losses by increasing prices.

**COUNT IV**
**Attempted Monopolization**
**Sherman Act, 15 U.S.C. §2**

161. Endure incorporates paragraphs 1 through 135 as if fully set forth as part of this Count IV.

162. Vizient engaged in an overt act of anticompetitive conduct.

163. Vizient had a specific intent to monopolize.

164.  Vizient had a dangerous probability of achieving monopoly power.

## COUNT V
### Declaratory Judgment
### 28 U.S.C. §2201

165.  Endure incorporates paragraphs 1 through 135 as if fully set forth as part of this Count V.

166.  An actual controversy exists between Vizient and Endure regarding whether Vizient violated the antitrust laws.

167. The district court has authority to declare the rights and legal relations of each party hereto.

## COUNT VI
### Injunctive Relief

168.  Endure incorporates paragraphs 1 through 135 as if fully set forth as part of this Count VI.

169.  Endure has pled at least one cause of action against Vizient.

170.  Endure has a substantial likelihood of success on the merits of its claims.

169.  There is a substantial threat the Endure will suffer irreparable harm if an injunction is not granted.

171.  Endure's threatened injury outweighs any threatened harm to Vizient if an injunction is granted.

172.  Granting preliminary and/or permanent injunctive relief will not disserve the public interest.

**Prayer for relief**

Wherefore, Plaintiff Endure Industries, Inc. respectfully requests that this Court, as authorized by 15 U.S.C. §26, Federal Rule of Civil Procedure 65, 28 U.S.C. §2202 and pursuant to its own equitable powers, enter final judgment in favor of Endure and against Vizient, jointly and severally:

a.  Declaring that Vizient violated the antitrust laws against Endure.

b.  Preliminarily enjoining Vizient from engaging in its unlawful conduct;

c.  Permanently enjoining Vizient from engaging in its unlawful conduct;

d.  Permanently enjoining Vizient from engaging in similar and related conduct in the future;

e.  Awarding reasonable and necessary attorneys' fees and costs to Endure; and

f.  Granting any additional relief at law or in equity to which Endure justly may be entitled.

**Endure Demands a Jury Trial.**

Dated October 20, 2020.

Respectfully submitted,

**Yocom Rine Law Offices**

/s/ Jana Rine

_____

Jana Rine
SBN 11081400
2150 S. Central Expressway
Suite 200
McKinney, Texas 75070
Telephone: 972-439-2761
Facsimile: 469-219-3201
Email: jrine@yocomrinelaw.com

*Attorney for Endure Industries, Inc.*