IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ENDURE INDUSTRIES, INC.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Cause no. 3:20-CV-3190** |
| **v.** | § | |
| | § | |
| **Vizient, Inc., a Delaware corporation,** | § | |
| **Vizient Supply, LLC, a Delaware limited** | § | |
| **liability company, Vizient Source, LLC,** | § | |
| **a Delaware limited liability company,** | § | |
| **Provista, Inc., a Delaware corporation,** | § | **Jury Demand** |
| | § | |
| **Defendants.** | § | |

## FIRST AMENDED COMPLAINT

Pursuant to Sherman Act §§1 and 2 (15 U.S.C. §§1and 2) and Clayton Act §§3, 8 and 16 (15 U.S.C. §§14, 19 and 26), Plaintiff Endure Industries, Inc. ("Endure"), by its undersigned attorney, files this Complaint against Vizient, Inc., Vizient Supply, LLC, Vizient Source, LLC, and Provista, Inc. (collectively and alternatively, "Vizient"). Endure seeks Declaratory Relief pursuant to 28 U.S.C. §2201, Injunctive Relief pursuant to 15 U.S.C. §26 and trebled damages pursuant to 15 U.S.C.§15.

## NATURE OF THE ACTION

1. This antitrust case involves Defendants' unlawful restraint of trade and exclusionary conduct in the marketing, sale, and distribution of medical disposable products to Vizient Member hospitals throughout the United States. The Vizient

Member hospitals are initial purchasers who pass through on itemized invoices the list price of each unit used by each consumer patient.

2.  Vizient is a dominant supplier of medical disposable products, in horizontal competition with Endure, to market, sell and distribute medical disposable products. Vizient also directly competes using the Novaplus label.

3. Alternatively, Vizient is a two-sided transaction platform.

4.  Vizient unreasonably restrains trade using a Group Purchasing Organization ("GPO") framework to deny access to Endure and other competitors. Endure identifies Vizient as a competitor based on a functional definition of marketing and sales.

5. Vizient employs a scheme by which Defendants' competing product brand, Novaplus, is not subject to the same market restraints imposed on Endure and other competitors by Vizient's Group Purchasing Organization ("GPO").

6. Alternatively, Vizient harms competition on each side of a two-sided transaction platform.

7.  Vizient has excluded competitors and harmed competition through a set of interrelated policies and practices:

      a.  Vizient denies access by suppliers to hospitals who purchase medical disposable products unless the supplier includes Vizient's Impact Standardization Program ("ISP") terms in the supplier's bid.

b. Vizient employs a bidding process to exclude all but one supplier in each product category for purchase by its thousands of Member hospitals.

c. Participating hospitals must pay for supplies within the ISP to avoid a penalty in the form of lost supplier rebates ("Non-compliance Penalty").

d. To avoid the Non-compliance Penalty, compliant hospitals are forced to pay a "Double-payment Penalty" in order to remain eligible for rebates on all ISP products if the hospital chooses the competitor's product. Member hospitals are thus effectively penalized for, or prevented from, opting out of the ISP to choose a competitor's product.

e. Vizient employs a staggered termination date strategy whereby each product category within the ISP has a different term.

8. Vizient awards access to an exclusive bidder for each ISP product Category. This exclusive supply arrangement denies competing suppliers the ability to compete in the relevant market.

9. Vizient's "no ISP-no access" policy increases prices paid by Member hospitals. Because the rebate is separated from the list price, supra-competitive prices are maintained at the end-user level.

10. The ISP restricts rival sales by bundling each Member hospital's contestable demand for the medical disposable product units the Member hospital is willing to switch to rival products. The ISP made it costly to switch from the Vizient Chosen

Product to Endure despite Endure's lower price. Substantial market foreclosure resulted.

11.  Vizient's denial of competitor access to Vizient's supply directory, through which Vizient sells Novaplus and ISP Chosen Supplier products bolsters Vizient's ability to maintain elevated prices and to diminish competition.

12.  Similarly, Vizient's denial of competitor access to Vizient's Impact Standardization Program, through which Vizient sells ISP Chosen Supplier products strengthens Vizient's ability to maintain elevated prices and to diminish competition.

13.  By requiring participating hospitals to pay the ISP price even if the hospital chooses a nonVizient-authorized product, Vizient in effect imposes a penalty in two forms: 1) the Double Payment Penalty is imposed when a Compliant hospital chooses a nonVizient-authorized product because the hospital must also purchase the Vizient-authorized product to maintain rebate eligibility on all other products and 2) the Noncompliance Penalty is imposed when a noncompliant hospital purchases a nonVizient-authorized product or fails to meet the required purchase volume. Rebates are lost on all purchases for the quarter.

14.  Vizient's conduct has harmed competition and the competitive process and threatens further consumer harm.

**PARTIES**

15.   Plaintiff Endure Industries, Inc. is a New York corporation headquartered at 45 N. Fulton Street, Homer, New York 13007.

16.   Defendant Vizient, Inc. is a Delaware corporation headquartered at 290 E. John Carpenter Freeway, Irving, Texas 75062. Vizient, Inc. has been served with process and has appeared. Vizient began operations in 1994 as Voluntary Hospitals of America, Inc. and was known as VHA until 2015, when VHA merged with Novation, LLC. Byron Jobe is Vizient Inc.'s treasurer, David Berry is the secretary, Tim Moore is an assistant treasurer and Kathy Beasley as an assistant treasurer.

17.   Defendant Vizient Supply, LLC is a Delaware corporation located at 350 N. Paul, Dallas, Texas. Vizient Supply LLC has been served with process and has appeared. Vizient Supply, Inc. is managed by Byron Jobe as president, David Berry as Secretary and David Ertel as Treasurer. Each Vizient Supply, Inc. manager offices at 250 E. John Carpenter Freeway, Irving, Texas. Vizient Supply used the assumed name Novation, LLC. Vizient Supply owns the trademarks for "Novation" and "Novaplus." Vizient Supply, Inc. is a member of Vizient Source, LLC.

18.   Defendant Vizient Source, LLC is a Delaware corporate located at 290 E. John Carpenter Freeway, Irving, Texas 75062. Vizient Source, LLC has been served with process and has appeared. Vizient Source, LLC is managed by Byron Jobe as president, David Ertel as treasurer, David Berry as secretary, Kathy Beasley as assistant secretary and Tim Moore as assistant treasurer. Vizient Source, LLC used Novation Source, LLC

as an assumed name until the merger of Vizient and Novation in 2015. Vizient Source provides services to Member hospitals and participates in the antitrust conduct alleged by denying Member access to Endure's lower-priced, high quality, medical disposable products. As a result, patient access is similarly denied by the actions of Vizient Source, LL.

19.  Provista, LLC is a Delaware corporation. Its corporate headquarters are located at 250 E. John Carpenter Frwy., Irving, Texas 75062. It has been served with process as Provista Supply Chain Solutions, Inc. and has appeared. The company's 2019 Texas Franchise Tax Information Report was filed as Provista, Inc. The company is managed by Byron Jobe as board chairman.

20. The parties share corporate headquarters at 250 E. John Carpenter Freeway, Irving, Texas. Vizient Supply, LLC has a different headquarters address, but is managed by individuals who office at 250 E. John Carpenter Freeway. The companies are managed by some of the same individuals, as listed.

21. A proposed Supplier Agreement was required in supplier offers submitted in response to Vizient's Request for Proposals. Each proposed supplier offer named Vizient Supply LLC, Vizient, Inc. and Provista, Inc. as parties.

## JURISDICTION AND VENUE

22.  The Court has subject matter jurisdiction over Endure's antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. §26, and 28 U.S.C. §§1331 and 1337.

6

23.  This Court has personal jurisdiction over each Defendant. Each Defendant is headquartered in this District. Also, each Defendant has engaged in sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both United States and Texas law such that the exercise of jurisdiction over each Defendant would comport with due process requirements.

24.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because each Defendant maintains its principal place of business in the State of Texas and in this District, and because a substantial part of the events or omissions giving rise to Endure's claims occurred in this District. In the alternative, personal jurisdiction and venue may be deemed proper under Section 12 of the Clayton Act, 15 U.S.C. §22, because each Defendant may be found in or transacts business in this District.

## FACTS

### A. Endure manufactures, markets, sells and distributes in the relevant market.

25. Plaintiff Endure Industries, Inc. ("Endure") is an accredited enterprise, owned by a female practicing physician of ethnically diverse heritage. Endure incorporated in 2016 and opened for business in 2017 with the innovative goal of radical price transparency to provide lower cost products to hospitals.

26.  Endure manufactures, distributes, markets and sells "medical disposable products," which constitute the least technically complex subset of all devices sold in the medical supply market. In other words, the products exhibit a high degree of

interchangeability and, thus, sensitivity to price. Medical disposable products account for one of the highest-volume sectors in the field.

27.  Endure has conducted rigorous advertising campaigns and other marketing endeavors. However, due to Vizient's closed Network of hospitals and the ISP, Vizient has foreclosed a substantial portion of the medical disposable product market for United States hospital sales to Endure and all other nonVizient suppliers, while driving market share to Vizient, each ISP-chosen supplier and each Novaplus licensee.

28.  One of the foundational tenets of Endure is a commitment to radical transparency in pricing. With greater transparency comes lower costs and greater savings predictability for hospitals and their patients.

29.  What makes Endure unique is its ability to deliver high quality products at affordable prices to hospitals by streamlining the medical disposable product production and delivery process. Endure utilizes data-driven optimization and technological automation to fine-tune every step along the sourcing pipeline—including operational logistics, inventory management and distribution.

30.  Studies show that at least 1000 Endure products, sold at the most common hospital-requested unit of measure, are 10-50% more affordable than the lowest prices offered by Vizient and other leading GPO's.

### B. The purpose served by GPOs has changed.

31.  Group Purchasing Organizations came into prominence in the United States during the last two decades of the Twentieth Century, with the advent of the 1990s' prospective payment system for inpatient hospital reimbursement and the rise of managed care organizations.

32.  During that time, fee-for-service reimbursement was increasingly replaced by managed care. Because many corporations at that time saw managed care as an employee insurance cost-saving measure, hospitals began to form groups. The purpose of the groups at that time was to employ economies of scale by helping hospitals approach supply manufacturers with volume purchases.

33.  The early purpose of the GPO was to save procurement costs by allowing a centralized organization to accept a 3% fee in exchange for managing supply chain issues. Hospitals also sought to reduce supply costs to meet the new cost-saving demands of managed care programs. At that time, the federal Anti-Kickback law was amended to allow GPOs to accept a 3% administrative fee from the Member hospitals.

34. Vizient now encourages competitive bidding of the percentage administrative fee under an Anti-Kickback law amendment which removes the cap when each vendor, rather than a hospital, separately negotiates a fee.

35.  Questions arose in the early part of this century when some studies showed that prices charged to hospitals through GPO's were higher than hospitals could negotiate independently. After the Anti-kickback deregulation of the GPO

administrative fee exemption, the cost of the GPO procurement function shifted from the hospitals to the vendors. Even if the supply chain management function is now overpriced, other factors, including lack of transparency, prevent hospitals from taking on the procurement function to replace the GPO.

36. Vizient is abusing the entrenched market power and position it obtained by being a regulated-cost intermediary.  Now that Vizient is in the dominant position, it can extract higher fees, rebates from suppliers, and favor their own products with undisclosed price incentives to Member hospitals that tend to exclude equally efficient competitors.

37. Hospitals have had limited practical alternatives to the medical disposable products offered by Vizient, in particular, and GPOs in general.

38. The list price paid by Member hospitals are passed through to patients on itemized invoices listing each medical disposable product used by each patient. The patients have no choice among any lower-priced alternative medical disposable products.

### C. The relevant market is US medical disposable product sales to hospitals.

40. The term "relevant market" is defined as the market in which the anticompetitive effects of the challenged conduct are measured, which is typically the arena within which significant substitution in consumption and production occurs.

41. The geographic market in this case is the United States.

42. In this case, the relevant market is no greater than medical disposable products marketed, sold and distributed to hospitals.

43. The relevant market includes distribution, marketing and sales to hospitals, which are a unique type of purchasing agency. Many hospitals are nonprofit organizations that are government subsidized and tax exempt. Hospitals are given significant auxiliary benefits. For instance, Medicare reimburses hospitals at a significantly higher rate than privately owned surgery centers. Patient insurance covers the list price of many of the medical disposable products.

44. Hospitals are further differentiated from other markets because hospitals give an estimate of their needs in advance. Hospitals buy medical disposable products in volume, so that shipping cost per item is minimized. Manufacturing on demand eliminates or reduces costs, such as warehousing and product expiration.

45. Endure manufactures, markets, sells and distributes a full array of medical disposable products to hospitals and has the capacity to submit a proposal for any Vizient bid invitation within the medical disposable market.

46. Endure contracts with manufacturers globally and can produce items within a 3 to 6-month lead time, subject only to patent restrictions.

47. The hospital market for medical disposable products is distinct from other medical-surgical supply buyers. Hospitals demand a higher volume of product, a broader product mix and a higher level of vendor service than do other customers.

11

Hospital supply is a low-margin, high-volume business. Trade to non-hospital customers is a higher-margin, smaller scale business.

48. While most hospital supply companies can service smaller, non-hospital clients, the reverse is not true. Any transition from the physician supply business to the hospital supply business is difficult and requires increased efficiencies, which include warehouse space, computer capacity, supply chain logistics and access to capital.

49. An example of the variability in medical device design and the diversity of product combinations available in the hospital market includes a commonly used absorbable PGA suture with needle.

50. Based on sharpness, there are eleven types:



**Needle Types and Tip Geometrics**

| | Code | Tip Geometry | Needld Cross-section |
|---|---|---|---|
| Taper Point / Round Body | TA | | ⊙ |
| Reverse Cutting | RC | | ▽ |
| Premium Cutting Reverse | P | | ▽ |
| Cutting | CU | | △ |
| Premium Cutting | PC | | ⚠ |
| Spatula | SP | | ⬛ |
| Taper Cut | TC | | ⊗ |
| Trocar | TR | | ⟁ |
| Calcified Coronary | CC | | ⊛ |
| Blunt Point | BL | | ● |
| Diamond | D | | ⊕ |

51. There are 7 common shapes:



52. Needle are fabricated in  11 sizes:



53. The sutures that come with each needle type has a different length, such as 45 cm, 75 cm and 90 cm.

54. Endure has the capacity to meet hospital supply requirements across all medical disposable product lines.

### D. Vizient as horizontal competitor.

#### 1. Vizient GPO competes horizontally with suppliers.

55. Vizient markets, sells and distributes medical disposable products to Member hospitals in the United States. This allegation is made based on the function performed by Vizient as compared to marketing and selling functions performed on behalf of manufacturers in analogous industries, which pay a percentage fee for such services based on volume of sales. A three-percent fee is not uncommon in analogous industries.

56. Under a real-world business definition that is not contrived to fit an outmoded function, Vizient contracts with manufacturers and distributors to fabricate medical disposable products and then markets and sells the products to hospitals in return for a percentage of sales volume.

57. The same medical disposable product manufacturers and distributors also market and sell medical disposable products to competing hospitals and GPOs. Discovery is necessary to determine whether direct sales to hospitals are measurable within any relevant antitrust model.

58. Thus, Vizient competes with suppliers in the market.

59. Vizient is a horizontal competitor of Endure because Vizient is the primary source for Member hospital procurement.

### *2. Vizient as a horizontal competitor through Novaplus.*

60. Novaplus is a private label brand sold directly to Member hospitals.

61. Suppliers pay an estimated 10-15% licensing fee to Vizient to place the Novaplus logo on their products.

62. Novaplus brands are not subject to the restrictions imposed by the ISP.

63. An example of a Novaplus product is Flexal gloves manufactured and distributed by Cardinal Health. Flexal is leading brand. Cardinal Health, however, places a Novaplus logo on Flexal glove boxes and pays Vizient a licensing fee.





64. Vizient thus imposes additional costs on rival glove manufacturers, allowing Novaplus-licensed products to bypass the bidding process and to avoid the administrative fee. The licensing fee should be considered in applying variables such as incremental costs, discount attribution, incremental revenue and contestable portion of market share.

65. The license fees paid by Novaplus suppliers should be included in the appropriate measure of cost analysis in addition to the ISP rebates, administrative fees and other discounts when applying any iteration of the *Brooke Group* or *Tampa Electric* tests.

66. The license fees are also relevant to a recoupment analysis under any applicable test.

67. Novaplus medical disposable product sales should be included in the total sales for computation of market share and market power, to any extent such as showing is required.

### E. Vizient as two-sided transaction platform.

68. Alternatively, Vizient markets, sells and distributes medical disposable products as a two-sided transaction platform.

69. One side of the platform facilitates transactions from suppliers, which market, sell and distribute medical disposable products to Member hospitals through Vizient, Inc., Vizient Supply, and Provista.

70. Suppliers pay Vizient an administrative fee for performing this function which is based upon volume of sales. Each supplier seeking inclusion in the ISP competitively bids the administrative fee percentage payable to Vizient.

71. Suppliers pay to Vizient the rebates attributable to Member hospital medical disposable product sales. Vizient monitors Member hospital Compliance with the ISP and disburses rebate payments.

72. Vizient's revenue for performing the supplier side of the platform includes the private label fee Vizient charges competing suppliers for the Novaplus label. The estimated 10-15% private label licensing fee enables the Novaplus supplier to by-pass the bidding process and directly market, sell and distribute medical disposable products to Member hospitals.

73. Thus, the price charged by Vizient on each product for the supplier side of the platform is discounted by rebates on all products, the Vizient administrative fee and the Novaplus licensing fee. The rebates, administrative fee and licensing fee should be

considered in applying variables such as incremental costs, discount attribution, incremental revenue and contestable portion of market share.

74. Recoupment is made using artificially bolstered demand across all products in addition to data related to rebate accounting.

75. Alternatively, the ISP restricts rival sales by bundling each Member hospital's contestable demand for the medical disposable product units the Member hospital is willing to switch to rival products. The ISP makes it costly to switch from the Vizient Chosen Product to Endure despite Endure's lower price. Substantial market foreclosure results.

76. The Member hospital side of the platform facilitates marketing, sales and distribution of medical disposable products from Vizient Chosen Suppliers to Member hospitals through entities which include Vizient, Inc., Vizient Source and Provista.

77. Member hospitals do not pay a fee for the Vizient's services. Instead, the Vizient transaction platform is funded by the supplier-paid administrative fees which are based on sales volume of Member hospital purchases, Novaplus licensing fees and interest on rebates.

78. Member hospitals pay for Vizient's services, through the above-market list prices paid for medical disposable products.

### F. Vizient has power to impact competition in the relevant market.

79. The relevant market for the purpose of assessing Vizient's market power and competitive harm is no broader than that hospital market for distribution, marketing and sale of medical disposable products to hospitals in the United States.

80. The following data demonstrates a reasonable expectation that discovery will reveal evidence of any required market share or monopoly power element of Endure's claim, t any extent such a showing is required. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 255-57 (5th Cir. 2009).

81. Vizient acknowledges that it serves approximately 95% of the nation's academic medical centers and more than 50% of acute care health systems.



Vizientinc.com/members; Newroom.vizientinc.com/Vizient-announces-19-new-renewed-or-expanded-member-agreements-in-q1-and-q2-2020.htm.

82. The American Medical Association estimates 5,198 Acute-Care Hospitals in the United States. Vizient serves more than 50% of that portion of the market. Health Forum, LLC, *AHA Hospital Status* (2020 ed.).

83. An estimated 210 of Acute Care Hospitals are Academic Medical Centers. *Id.* Vizient serves 95% of that portion of the market. Vizientinc.com/members.

84. According to the American Association of Medical Colleges, Academic Medical Centers operate 71% of level 1 trauma centers, 98% of comprehensive cancer centers, 69% of all burn unit beds and 63% of pediatric intensive care beds. www.aamc.org/news-insights/academic-health-centers-save-millions-lives.

85. The average net patient revenue for an Academic Medical Center is approximately $1.23 billion and the average for all hospitals in the United States is $187 million. Definitive Healthcare, *Hospitals & INDs database,* 2020.

86. This means that Academic Medical Centers are responsible for approximately 24% of medical care in terms of net patient revenue. Expenditure for patient care (which is a useful metric for gauging total volume of patient services rendered) is expected to be proportional to net patient revenue.

87. Similarly, consumption of medical disposable products is also expected to be proportional to net patient expenditure.

88. At the given 95% of all Academic Medical Centers and 50% of Acute Care Health System, Vizient's market share in terms of total patient expenditure is substantial.

89. On or about November 2020, Vizient merged with the fourth largest GPO, Intalere. Vizient has recently merged with Intermountain and MedAssets. Newroom.vizientinc.com/Vizient-to-acquire-intalere-expanding-its-supply-chain-capabilities.htm.

90. As of February 2017, Vizient was ranked first in annual spend volume at $100 billion. Intalere was ranked fourth at $9 billion prior to merger. Beckerhospitalreview.com/finance/4-of-the-largest-GPOs-2017.html; softwareplatform.net/2017/10/19/group-purchasing-organizations-gpo-consolidation/?shared=email.msg=fail; Becker's Hopital CFO Report, *4 of the largest GPOs/ 2017.*

91. Near the time of the 2015 merger which resulted in Vizient, the GPO listed agreements with 600 suppliers and distributors, representing 90 percent of the products that healthcare organizations purchase.  https://www.beckershospitalreview.com/hospital-management-administration/7-largest-group-purchasing-organizations-for-hospitals.html?tmpl=component.

92.  Vizient is now the largest GPO.

93. The two remaining leading GPO's in the relevant market are Premier and Health Trust.

### G. Barriers to entry.

94. Barriers to entry, which include access to capital, supply chain logistics, GPO application costs and GPO exclusion limit medical disposable product market participants.

95. Vizient's disclosure that 95-98% of Network suppliers participate in the ISP indicates that suppliers not chosen by Vizient to participate in the ISP are largely excluded from the Vizient Network.

96. Supplier application to GPOs is a lengthy process and takes significant manpower. Each failed attempt amounts to weeks of lost hours and expenses. An anticipated supplier must provide a complex competitive bid for each product offered for sale.

97. Endure was accepted as a participant to bid for inclusion in the Vizient ISP tapes category of the Patient Care Program; the bid was not awarded to Endure.

98. Endure's competitor in the medical tape market to hospitals is a major manufacturer. Endure does not know whether Novaplus is a tape competitor.

99. Vizient's online platform accepted Endure product data for tourniquets, but the bid was not allowed to progress toward consideration.

100.  Until last year, Vizient contracted with ASP Global to supply tourniquets. This year, Vizient ended its contract with ASP Global and awarded the contract to Platinum Code, which agreed to supply tourniquets under Vizient's NovaPlus brand.



101. Endure's online bids related to additional products were not allowed access to the platform.

102. In 2018, Endure registered all of its medical disposable products under Vizient's diversity program (Confirmation number 4070) and paid the monthly subscription fee. Vizient did not award any contracts to Endure and did not facilitate any sales through Endure.

### H. Vizient Impact Standardization Program bundles restrain trade.

103.  Vizient promises the opportunity of supplier contracts for inclusion in Vizient database as an Authorized Distributor.

104.  Vizient describes its business a "providing purchasing opportunities with respect to high quality products and services to individual entities and groups of entities designated by Vizient to purchase under its contracts."

105.  Vizient, together with the Clients (Vizient Inc. and Provista), provide to each Member a copy of the Product Supplier Agreement for each supplier to whom a Vizient awards a contract ("Chosen Supplier"). Vizient invites the Chosen Suppliers to participate in meetings and other activities with Member hospitals. Vizient provides Chosen Supplier product samples to Member hospitals and lists the Chosen Suppliers' products in Vizient's online catalogue.

106.  Vizient charges an administrative fee on a percentage of Net Sales of products sold directly to Member hospitals by each Chosen Supplier as a separate portion of each competitive bid.

107. Vizient states that the ISP programs drive sustainable member purchase commitment to participating awarded suppliers.

108. Vizient claims that more than $7 billion is sales flow through the ISP annually.

109. Vizient's admits that the ISP provides "protection from competitive threats" and provides the opportunity to "pay for performance."



110. Vizient evaluates non-financial factors in addition to price and other financial factors. Contracts may be awarded to vendors whose proposals do not offer the lowest prices. The non-financial factors are: 1) Clinical quality and acceptability; 2) depth and breadth; 3) member preference; 4) service, supply, and value-added services; 5) environmentally preferred capabilities; 6) adherence to proposed terms and conditions.

111. Vizient's non-financial factors and non-price financial factors are not defined by specifications.

112. Vizient states a non-price goal of "reducing variation" for non-clinically preferred products, although Vizient does not provide information concerning how bidding suppliers can meet any clinical preference standard.

113. The ISP offers 13 Programs: 1) Airway Management; 2) Bedside Care; 3) Family Care; 4) General Medicine; 5) General Surgery; 6) Infection Prevention; 7) Imaging; 8) Orthpedic; 9) Patient Care; 10) Specialty Care; 11) Support Services; 12) Food; 13) Novaplus Pharmaceuticals.

114. The Patient Care Program (#9) includes 11 Categories: 1) Adhesive Tapes; 2) Bowel Management; 3) Disposable Patient Positioners; 4) Disposable Sharps Containers; 5) Monitoring Electrodes; 6) Nonsterile Kits; 7) Patient Care Plastic and Steel Products; 8) Patient Skin Care; 9) Transparent Dressings; 10) Urinary Catheters and Related Products; 11) Bonus: Disposable Stethoscopes.

115. Each of the 11 categories includes numerous products.

116. Vizient awards one or two contracts for each Category. Each Member hospital participant chooses one supplier of the two Chosen Suppliers for each Category.

117. Each Member hospital negotiates with the Vizient Chosen Supplier in each category to set an Annual Potential spend amount.

118. A Member hospital is eligible for Vizient awarded rebate if the hospital purchases all products within all Categories across all Programs (except one opt-out category within each Program).

119. Member hospitals are eligible for rebates based on "Compliance."

120. Compliance is first measured at the Program level each quarter.

121. Vizient uses the total dollar volume of a Member hospital purchases in each of the 13 Programs to determine Compliance.

122. If a Member hospital is 75% Compliant across all Programs, it is eligible for rebates if it meets a second Compliance threshold in any Category. That means that if a Member hospital fails to purchase 75% of the Annual Volume Potential in all Programs, it is not eligible for any rebates for any products.



123. For Compliant Member hospitals at the Program level, however, Compliance is determined at the Category level. Program Compliant hospitals earn rebates in Categories in which they reach 90% Compliance.

124. Participants will not earn any rebates in Categories where they reach 90% Compliance if they do not also reach 75% Compliance across all Programs.

125. Thus, hospitals which do not reach the high Compliance threshold pay higher prices. Hospitals which purchase outside the ISP must buy additional product within the ISP to remain in Compliance and sustain rebate eligibility on all products— bolstering demand.

126. Rebates are not utilized as a medical disposable product price decrease and instead are paid to the hospital administrator for capital expenditures or perks. Thus, the rebates do not directly reflect a discounted price.

127. Alternatively, each product price is discounted by rebates on all products sold under the ISP.

### I. Supplier access.

128.  Each product vendor who seeks access to the medical disposable product marketing, sales and distribution market to Vizient Member hospitals must include in its offer an electronically signed Product Supplier Agreement ("PSA") for each product the vendor wishes to sell. Endure e-signed a Product Supplier Agreement to supply tapes on or about September 16, 2019. Vizient declined to accept Endure's offer.

129.  Endure submitted its Request for Proposal for tapes on or before September 20, 2020. The RFP provided a list of 99 types of tape together with specifications and pricing. Endure provided samples of its tapes on or before September 20, 2019.

130. After several steps in the process toward acceptance in the tape category of the patient care ISP program, Endure's bid was rejected.

131. Endure was excluded from the tape market to Vizient Member hospitals.

132. Participation in the ISP, which is available to all awarded suppliers, includes access for sales to Member hospitals beyond the awarded product.

133. According to Vizient, ISP participants have access to Member hospitals to persuade them to change products. Non-participants in the ISP lack access to the platform for such discussions.

134. Endure alsosoug ht to submit an online application for participation in the tourniquet category. Vizient did not invite Endure to submit an RFP for participation in the tourniquet category. Endure was excluded from the Vizient portion of the tourniquet market.

135. Vizient further denied access to Endure for participation as a Network provider.

136. Endure's participation for all Endure products in Vizient's diversity program did not result in any sales or evidence of Vizient facilitation of any access to a Member hospital.

137.  Thus Vizient substantially foreclosed Endure from access to Vizient's share of the hospital market for medical disposable products.

### J. "No ISP—No Access"

138.  Vizient conditions supplier access to Vizient's portion of the hospital market for medical disposable products on supplier acceptance of terms of a program called Impact Standardization (ISP) under which bundles of unrelated products are sold and distributed to Vizient Member hospitals.

139. Vizient discloses that 95-98% of Vizient suppliers participate in the ISP. Because each bidder must agree to the ISP terms, it is difficult to discern under what terms the 3 to 5 % are exempt.

140.  The Vizient policy imposes a bidding process that largely ignores price as a factor in favor of other vague and undefined factors.

141. Vizient evaluates non-financial factors in addition to price and other financial factors. Contracts may be awarded to vendors whose proposals do not offer the lowest prices. The non-financial factors are: 1) Clinical quality and acceptability; 2) depth and breadth; 3) member preference; 4) service, supply, and value-added services; 5) environmentally preferred capabilities; 6) adherence to proposed terms and conditions.

142. Vizient's non-financial factors and non-price financial factors are not defined by specifications.

143.  The bundling program forces Member hospitals to purchase "all or nothing" from the Vizient Chosen Supplier for each product.

144. Thirteen Programs cover all types of medical disposable products.

145. Each Program has multiple related and unrelated products, called Categories.

146.  Each Member hospital chooses one supplier for each Category of products. Each Member hospital loses rebates when it switches from one supplier to another even within the Program (Non-compliance Penalty).

147.  The ISP results in increased prices that member hospitals and their patients must pay on Vizient-based products.

148. Alternatively, the ISP results in discounted prices below an appropriate level of cost with recoupment sustained by bolstered demand and separate documentation of rebates and list price.

149. Without the "no ISP-no access" policy, Member hospitals would have the ability and incentive to challenge Vizient's pricing demands by purchasing lower-cost products.

150.  Vizient states that 80% of Vizient Members (including non-hospitals) participate in the ISP, but information concerning the percentage of Member hospital participation is not available.

151. The hospital and supplier percentages, together with the market share data, plausibly pleads a substantially foreclosed market.

### K. Program terms define "compliance."

152.  Under the PSA, each applicant supplier is required to participate in the Impact Standardization Program, under which the Supplier pays rebates to Vizient. Vizient monitors Member hospital compliance for rebate eligibility.

153.  The Program is employed by Vizient through Net Sales reports provided by the Supplier. Vizient determines whether a Member qualifies for rebates. Compliant Members are eligible for rebates on Net Sales of all Products across all Categories sold by all Chosen Suppliers. Any lost rebate encompasses all products purchased during a quarter.

154. Vendors bid rebate amounts to Vizient. Member hospitals and Vizient Chosen Suppliers negotiate anticipated annual purchase volume.

155.  Compliance is measured by the extent to which quarterly purchases meet the purchase volume goal.

156.  Each Member is asked to participate in all 13 Programs and each Category (except one "Opt-Out" category).

157.  A Member hospital is not eligible for access to any ISP rebates until it reaches an aggregate Compliance level of 75% across all 13 Programs. If the 75% requirement is met, additional conditions apply.

158.  No Rebates are paid until further compliance of 90% is reached within each

product category, each of which includes as many as 10 types of unrelated products,

each product type containing several specified items.

### L. Vizient's "no ISP-no access" policy compels hospitals to accept Vizient's ISP terms.

159.  Vizient's "no ISP-no access" policy has significantly influenced hospital

participation in the Vizient ISP and in prices paid by hospitals and their patients in the

relevant market.

160.  To obtain access to Vizient's listed products, Member hospitals accept

Group Purchasing Organization terms which impose product choice by a non-

consumer GPO committee based on factors which diminish price and quality

consideration.

161.  Instead, the prices Member hospitals pay for medical disposable products

reflect Vizient's dominant position in the market and Vizient's ability to exclude

competitors.

162.  The prices include an added increment which compliant Member hospitals

pay to avoid penalties in the form of a required payment for in-program products even

if out-of-program products are chosen (Double-payment Penalty). Even the single

allowed opt-out product imposes a penalty because the hospital must meet the

minimum required 90% purchases within the Category of products from which the opt-

out product is chosen in order to qualify for supplier rebates in all of the other

Categories within the Program. If non-compliant, Members pay prices for all purchased products, without any rebates, imposing a Non-compliance Penalty. During the contract term, Vizient discourages Member hospital from vetting out-of-Network products and from fielding any potential competitive prices from out-of-Network vendors.

### M. Staggered terms.

163.  Vizient employs a staggered termination date strategy, under which a Member's and/or Supplier's termination date for each product Category within a Program differs.

164.  The supplier agreement term is generally three years and automatically renews for two years for each product submitted.

165.  Each of the multiple Programs within the Impact Standardization Program has a different beginning and ending date. Similarly, a contract awarded under each Category within each Program begins and ends on a distinct date.

166.  The staggered terms make exit from the Impact Standardization Program nearly impossible. Because 75% compliance across all Categories allows a Member access to rebates based on 90% compliance within a Program, any departure from the Impact Standardization Program will cause substantial loss of rebates in all other programs until those Programs and Categories terminate. Thus, if a Member wants to

change GPO's or suppliers it must allow each Program to terminate, losing price-significant discounts on all other products until the last Program terminates.

### N. Penalties for non-compliance.

167. The non-price factors imposed by Vizient, together with supplier rebates, administrative fees, licensing fees, penalties for non-Compliance and other possible payments are incorporated into the prices charged to Member hospitals, harm competition.

168. The non-price factors allow market exclusion by increasing rivals' costs.

169. The exclusionary conduct causes increased prices, reduced output, reduced consumer demand and disincentive for competitive investment and innovation.

170.  If Vizient used its market dominance solely to raise the nominal prices on ISP supplier products and Vizient Novaplus products, those price increases would have spurred hospitals to seek substitutes and would have attracted entry and competitive pricing from competitors.

171.  By contrast, imposing a penalty—which compliant hospitals must pay regardless of whether they use the Vizient-offered program product or a product supplied by a Vizient competitor—enables Vizient to raise the all-in prices of medical disposable products without spurring substitution or attracting entry.

172.  Vizient actively hinders substitution and prevents entry.

### O. Vizient's agreements foreclosed a substantial portion of competition in the relevant market.

173.  At least one Chosen Supplier entered an ISP agreement with Vizient which unreasonably restrained trade in the relevant market by agreeing to supply a medical disposable product, to pay rebates to Vizient related to Member hospital purchases and to pay an administrative fee to Vizient.

174. At least one Member hospital entered an ISP agreement with Vizient which unreasonably restrained trade in the relevant market by agreeing to pay a supra-competitive price for at least one medical disposable product.

175. At least one Member hospital entered an ISP agreement with Vizient which unreasonably restrained trade in the relevant market by agreeing to purchase at least one medical disposable product beyond the hospital's needs in order to remain Compliant within the ISP.

176. At least one medical disposable product supplier paid a licensing fee to Vizient in return for access to Member hospitals.

177.  Each agreement effectively foreclosed Endure and Vizient GPO competitors from participation in the medical disposable products market to Vizient Member hospitals.

178.  Market foreclosure in the relevant market was substantial.

179.  To any extent price is a predominant factor, the ISP rebates on all purchased products, ISP penalties, Novaplus licensing fees, administrative fees, and other incentives paid to participants and as a function of Chosen Supplier price (bolstered by

Vizient) exceeds the appropriate measure of cost of each individual medical disposable product purchased.

180. Similarly, Vizient non-price factors as previously alleged increase rivals' costs.

181. Alternatively, to any extent price is not a predominant factor if the ISP rebates on all products purchased, ISP penalties, Novaplus licensing fees, administrative fees, and other incentives paid to participants as a function of discount from Chosen Supplier price are not deducted from the list price and, as such, increase rivals' costs.

182. Alternatively, the ISP restricts rival sales by bundling each Member hospital's contestable demand for the medical disposable product units the Member hospital is willing to switch to rival products. The ISP made it costly to switch from the Vizient Chosen Product to Endure despite Endure's lower price. Substantial market foreclosure resulted.

183. Vizient's exclusive deal with each chosen medical disposable product supplier under the ISP excluded competition from other medical disposable product suppliers and harmed competition.

184. The agreement effectively foreclosed Endure, Vizient GPO competitors and medical disposable product supplier competitors from supplying medical disposable

products to Vizient Member hospitals and associated medical disposable product consumers.

185. Market foreclosure was substantial.

186.  The Vizient ISP agreements with Member hospitals and with Chosen Suppliers unreasonably restrained trade.

### P. Harm to competition caused by Vizient's practices.

187. The harm to competition includes increased costs of medical disposable products above the competitive level which are paid by Member hospitals, increased prices charged to Member hospitals and end user patients for medical disposable products and otherwise stifled competition.

188. Harm to competition on the hospital side of the platform includes the percentage fee absorbed by Member hospitals for volume of purchased Novaplus brand, for which suppliers pay a direct fee to Vizient. This increased cost to Member hospitals caused prices above the competitive level.

189. In addition, the harm to competition includes increased non-price costs of marketing, selling and distributing medical disposable products to hospitals above competitive levels, such as the increased cost imposed on ISP suppliers both in fees paid to Vizient and in rebates paid to Member hospitals. The ISP suppliers must also compete with the Novaplus brand, which is exempt from ISP costs.

190. Harm to competition on the supplier side of the platform is the undisclosed or vaguely disclosed non-price factors considered by Vizient for access to the platform related to medical disposable products which are largely interchangeable and are not generally differentiated on a basis other than price. The non-price factors stifle competition among medical disposable product suppliers by raising costs of rivals.

191. The ISP, imposed on the supplier side of the platform, denies hospitals and end user patients the ability to express a preference for lower-priced products.

192. While suppliers compete to offer the lowest price within the framework of a Vizient award, Vizient chooses the "best" application(s) to be awarded on the basis of undefined factors.

193. The undefined factors prevent rival suppliers from demonstrating how their product meets any standard. No specifications are provided.

194. The lack of standard gives Vizient recourse to choose a supplier without regard to the bid information.  The "blind" bid process ensures Vizient is the only party privy to the prices offered – neither the bidding suppliers nor member organizations ever see the offered price and other product attributes.

196.  Vizient's anticompetitive conduct has relaxed the constraints that competitors' entry and expansion would otherwise impose on product choice and all-in prices in the medical disposable product market.

197.  By impairing Member hospitals' freedom of choice for competitors' medical disposable products through imposition of penalties, Vizient controls Member hospitals' demand for those products, reduces competitors' sales and margins, and diminishes competitors' ability and incentive to invest and innovate.

198.  Vizient's anticompetitive conduct gives little regard to price considerations in making its sales decisions, charging inflated prices through use of Vizient's market power. Absent Vizient's conduct, medical disposable products would be sold to consumers through Member hospitals under fair, reasonable, and equitable terms and would not include elevated prices that penalize Members, raise competitor costs, and reflect artificially bolstered demand supported by ISP penalties.

199.  Absent Vizient's unlawful conduct, Vizient could obtain fair compensation for its marketing, sales and distribution efforts while its competitors could compete based on the merits of their respective offerings.

200.  Vizient's practices have harmed competition and consumers within the market for medical disposable products.

201.  Vizient's practices are not reasonably necessary to accomplish any significant procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and Vizient reasonably could achieve any procompetitive goals through less restrictive alternatives.

202.  Developments in the industry reflect the natural consequences of Vizient's conduct.

203.  Few companies can muster the capital, focus the manpower and endure the application time delays necessary to compete to supply goods to hospitals. There are few competitors, and the fate of unsuccessful competitors is not yet known.

204.  If Vizient's remaining competitors (rival suppliers), were to exit the business because of Vizient's anticompetitive conduct, this would have a significant adverse impact on competition in disposable medical product markets and on innovation.

205. If Vizient removed ISP restraints and simply offered tiered volume pricing, vendors could lawfully compete on the merits for Member hospital business.

206.  Competition often drives firms to innovate in next-generation methods. Enhanced innovation in the medical disposable product market largely include efficiencies in production and development that lead to cost savings. By suppressing innovation, Vizient's anticompetitive practices threaten these benefits.

207.  Vizient had no reasonable justification for its conduct.

208.  Endure was damaged monetarily as a proximate result of Vizient's conduct.

209.  As a direct and proximate result of Vizient's wrongful conduct, Endure was required to retain counsel and incurred reasonable and necessary attorneys' fees and costs.

**COUNT I**
**Exclusive Dealing Pursuant to**
*Tampa Elec. Co. v. Nashville Coal Co.,*
**365 U.S. 320 (1961)**
**Clayton Act (15 U.S.C. §14)**
**Sherman Act (15 U.S.C. §§1, 2)**

210. Endure incorporates paragraphs 1 through 209 as if fully sets forth as part of Count I.

211.  Vizient markets and sells in the relevant market by virtue of its conduct as a GPO under the ISP.

212. Vizient markets and sells in the relevant market by virtue of its Novaplus brand.

213. Alternatively, Vizient is a two-sided transaction platform.

214. Vizient's conduct harmed competition on each side of the platform.

215.  Vizient employed bundled discounts on numerous unrelated products which excluded competition.

216. Alternatively, at least one Vizient contract provides that a Member hospital must deal exclusively with a chosen supplier for each medical disposable product also offered for sale by Endure.

217.  It is probable that performance of any or each of the contracts described in paragraphs 173 to 186 herein will foreclose competition in the medical disposable product line of commerce affected.

218. Vizient's conduct impaired the opportunity of rivals.

219. Vizient's conduct does not further competition on the merits or furthers competition on the merits in an unnecessarily restrictive way.

220.  The foreclosed market share in each or every relevant product line is substantial.

221. To any extent price is not the predominant factor, at least one cost raising parameter is controlled by Vizient to raise rivals' appropriate measure of cost and may simultaneously increase the Vizient Chosen Supplier's average costs. The result is increased prices and foreclosure of the rival.

222. Alternatively, the ISP restricts rival sales by bundling each Member hospital's contestable demand for the medical disposable product units the Member hospital is willing to switch to rival products. The ISP made it costly to switch from the Vizient Chosen Product to Endure despite Endure's lower price. Substantial market foreclosure resulted.

223.  To any extent a showing of market power is required under this theory, Vizient has market power in the relevant market based on its ability to control price or demand. Vizient's power is shown by its strength relative to Endure, the percentage of volume of commerce involved in relation to total commerce in the market and the probable immediate and future effects that each contract may have on competition in the market.

234. As a proximate result of Vizient's wrongful conduct, Endure incurred monetary damages to be determined by the Court and trebled by law.

**COUNT II**
**Exclusive Dealing pursuant to**
*Brooke Group Ltd. v. Brown & Williamson,*
**509 U.S. 209 (1993)**
**Sherman Act, 15 U.S.C. §§1, 2)**

234. Endure incorporates paragraphs 1 through 209 as if fully sets forth as part of Count II.

235.  Vizient markets and sells in the relevant market by virtue of its ISP through its GPO.

236. Vizient markets and sells in the relevant market through its Novaplus brand.

237 Alternatively, Vizient is a two-sided transaction platform.

238. Vizient harms competition on each side of the platform.

239.  Vizient employed bundled discounts which excluded competition.

240. To any extent market power is a required element under this theory, Vizient has market power in each relevant market based on its ability to control price or demand. Vizient's power is shown by its strength relative to Endure, the percentage of volume of commerce involved in relation to total commerce in the market and the probable immediate and future effects that each contract may have on competition in the market.

241. To any extent price is not the predominant factor, at least one cost raising parameter is controlled by Vizient to raise rivals' appropriate measure of cost and may simultaneously increase the Vizient Chosen Supplier's average costs. The result is increased prices and foreclosure of the rival.

242.  To any extent price was the predominate factor involved in Vizient's exclusionary conduct, after allocating the rebates across all Categories and Programs, Novaplus license fees, administrative fees, and any other incentive payments, Vizient sold medical disposable products below an appropriate measure of cost.

243. Alternatively, the ISP restricts rival sales by bundling each Member hospital's contestable demand for the medical disposable product units the Member hospital is willing to switch to rival products. The ISP made it costly to switch from the Vizient Chosen Product to Endure despite Endure's lower price. Substantial market foreclosure resulted.

244. Vizient's and its supported suppliers have a reasonable chance of recouping any losses incurred through heavy discounts and fees by charging supra-competitive prices and artificially supported demand.

245. To any extent price is not the predominant foreclosing factor, Vizient recoups the cost of imposing the disadvantage to rivals in the form of supra-competitive prices and other market anomalies.

246. Vizient's conduct harmed competition in the relevant market.

247. As a proximate result of Vizient's wrongful conduct, Endure incurred monetary damages in amount to be determined by the Court and trebled by law.

## COUNT III
### Refusal to Deal
### Sherman Act (15 U.S.C. §1, 2)

248.  Endure incorporates paragraphs 1 through 209 as if fully set forth as part of this Count III.

249.  Vizient can control a price within its relevant product market or its geographic market or to exclude Endure from doing business within its relevant product market or geographic market.

250. Vizient is a horizontal competitor of Endure by virtue of its role in the manufacture, sale, and distribution of medical disposable products through the Vizient GPO and through Novaplus.

251. Vizient controls and maintains a facility in the form of a GPO which includes numerous Member hospitals and Network suppliers.

252. The facility is essential, because denial of access to the Vizient GPO which serves Member hospitals forecloses a substantial portion of the relevant market.

253.  Vizient has the type of control over the facility that is forbidden by the Sherman Act.

254.  Duplication of the facility by Endure is unreasonable or impractical.

255. Vizient denied Endure the use of the facility.

256.  Providing access to Endure was feasible.

257.  Alternatively, Vizient unilaterally turned down more profitable dealings for its Member hospitals which were available through Endure's low-cost products to drive Endure's exit or to disable Endure's ability to compete, thereby allowing Vizient, to any extent it is a horizontal competitor, or otherwise, allowing Chosen Suppliers to recoup losses by increasing prices.

258. As a proximate result of Vizient's wrongdoing, Endure incurred monetary damages in an amount to be determined by the Court and trebled by law.

**COUNT IV**
**Attempted Monopolization**
**Sherman Act, 15 U.S.C. §2**

259.  Endure incorporates paragraphs 1 through 209 as if fully set forth as part of this Count IV.

260.  Vizient engaged in an overt act of anticompetitive conduct as set forth in this Complaint.

261.  Vizient had a specific intent to monopolize as shown by Vizient's purchase of competing GPOs, a program which drives market share, and direct evidence a goal of "protection from competitive threats and rebidding" .

262.  Vizient had a dangerous probability of achieving monopoly power as shown by its aggressive increase in market share, its ability to control price and to artificially bolster demand in the relevant market.

263. As a proximate result of Vizient's wrongful conduct, Endure incurred monetary damages as determined by this Court and trebled by law.

## COUNT V
### Declaratory Judgment
### 28 U.S.C. §2201

264.  Endure incorporates paragraphs 1 through 209 as if fully set forth as part of this Count V.

265.  An actual controversy exists between Vizient and Endure regarding whether Vizient violated the antitrust laws.

266. The district court has authority to declare the rights and legal relations of each party hereto.

## COUNT VI
### Injunctive Relief

267.  Endure incorporates paragraphs 1 through 209 as if fully set forth as part of this Count VI.

268.  Endure has pled at least one cause of action against Vizient.

269.  Endure has a substantial likelihood of success on the merits of its claims.

270.  There is a substantial threat the Endure will suffer irreparable harm if an injunction is not granted.

271.  Endure's threatened injury outweighs any threatened harm to Vizient if an injunction is granted.

272.  Granting preliminary and/or permanent injunctive relief will not disserve the public interest.

### Prayer for relief

Wherefore, Plaintiff Endure Industries, Inc. respectfully requests that this Court, as authorized by 15 U.S.C. §26, 15 U.S.C. §15, Federal Rule of Civil Procedure 65, 28 U.S.C. §2202 and pursuant to its own equitable powers, enter final judgment in favor of Endure and against Vizient, jointly and severally:

a.  Declaring that Vizient violated the antitrust laws against Endure.

b.  Preliminarily enjoining Vizient from engaging in its unlawful conduct;

c.  Permanently enjoining Vizient from engaging in its unlawful conduct;

d.  Permanently enjoining Vizient from engaging in similar and related conduct in the future;

e.  Awarding monetary damages which are trebled as allowed by law;

f.  Awarding reasonable and necessary attorneys' fees and costs to Endure; and

g.  Granting any additional relief at law or in equity to which Endure justly may be entitled.

**Endure Demands a Jury Trial.**

Dated January 4, 2021.

Respectfully submitted,

**Yocom Rine Law Offices**

/s/ Jana Rine

_____

Jana Rine
SBN 11081400
2150 S. Central Expressway
Suite 200
McKinney, Texas 75070
Telephone: 972-439-2761
Facsimile: 469-219-3201
Email: jrine@yocomrinelaw.com

*Attorney for Endure Industries, Inc.*

**Johnston Clem Gifford PLLC**
Robert Gifford
Jim Bullock
1717 Main Street, Suite 3000
Dallas, Texas
Telephone: 972-474-1721
Email: rgifford@johnstonclem.com
jbullock@johnstonclem.com

*Attorneys for Endure Industries, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was served on counsel of record via CM/ECF on January 4, 2021.

/s/ Jana Rine

_____

Jana Rine