THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ENDURE INDUSTRIES, INC. | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. 3:20-cv-3190-X |
| | § | |
| v. | § | |
| | § | |
| VIZIENT, INC., a Delaware corporation, | § | |
| VIZIENT SUPPLY, LLC, a Delaware limited | § | |
| a Delaware limited liability company, | § | JURY DEMANDED |
| PROVISTA, INC., a Delaware corporation, | § | |
| | § | |
| Defendants. | § | |

---

**SECOND AMENDED COMPLAINT**

---

Pursuant to Sherman Act §§ 1 and 2 and Clayton Act §§ 3, 8, and 16, Plaintiff Endure Industries, Inc. ("Endure"), by its undersigned attorneys, files this Complaint against Vizient, Inc., Vizient Supply, LLC, Vizient Source, LLC, and Provista, Inc. (collectively, "Vizient"). Endure seeks Declaratory Relief pursuant to 28 U.S.C. § 2201, Injunctive Relief pursuant to 15 U.S.C. § 26, and trebled damages pursuant to 15 U.S.C. § 15.

## I.    INTRODUCTION

1.    Plaintiff Endure Industries, Inc. ("Endure") is a medical device manufacturing and distribution company founded in 2016. Since its founding, Endure has single-mindedly pursued one goal: to produce and distribute high-quality disposable medical supplies using radical price transparency as a means to lower medical costs for hospitals, insurers, and patients. This case targets the anticompetitive practices of Vizient, a monopolist stifling competition and innovation in a way that ultimately harms not only hospitals, but every individual who pays for health care services.

1

2.      Group Purchasing Organizations ("GPOs") like Vizient typically act as the administrative middlemen between disposable medical product suppliers like Endure and large health care providers like acute-care hospitals. GPOs carry out this role by, among other things, negotiating contracts between hospitals and disposable medical product suppliers. Hospitals in the United States typically use GPOs to purchase nearly all their disposable medical supplies ("DMS"). These products include, among other things, medical tapes, syringes, tourniquets, monitoring electrodes, and transparent dressings. Most hospitals—including the high-volume academic hospital systems that generate a significant portion of disposable medical supply revenues for manufacturers—will only purchase DMS through a GPO like Vizient.

3.      Vizient is the largest GPO in the United States. It grew larger in April 2021, when it acquired the then-fourth largest GPO in the nation, Intalere. According to its own documents, Vizient serves approximately 97% of the nation's academic medical centers, and over 50% of the nation's community hospitals. In recent years, Vizient contracts have generated more than double the annual purchasing volume than that of the next largest GPO. On information and belief, together these Vizient customers constitute at least 70% of the total spend on DMS through GPOs in the United States. Vizient's purchasing programs and policies effectively prevent member hospitals from joining competing GPOs or purchasing directly from individual suppliers like Endure.

4.      Although a properly operated GPO can lower healthcare costs both by reducing the administrative costs and by potentially obtaining discounts on DMS from producers, the consumer benefits of GPO participation are not automatic. Here, for example, rather than pass along efficiency-related savings to its hospital customers, Vizient has developed and exercised monopoly power through the mechanisms discussed below to the benefit of itself and its dominant suppliers, themselves often monopolists in their own right. Worse, Vizient has acted

illegally to preserve and expand its monopoly power by engaging in the anticompetitive and exclusionary practices Endure challenges here. In particular, Vizient has developed what it calls its Impact Standardization Programs ("ISPs"). Vizient's monopoly power—together with the implementation of the ISPs—constitute illegal exclusionary conduct that protects from competition both Vizient and the dominant producers with which it contracts.

5.      Specifically, Vizient's ISPs illegally exclude Endure and other DMS manufacturers from effective participation in the Relevant Markets described below. On the surface, Vizient's ISPs may appear attractive to Member Hospitals because participants purportedly receive substantial discounts for DMS when they purchase in bulk through the ISPs. In reality, however, the ISPs are structured to lock those Member Hospitals into purchasing virtually all of their DMS from Vizient's chosen providers. The ISPs accomplish this goal in at least three ways. First, participating Member Hospitals do not receive real-time discounts on each product they buy, but rather become eligible for aggregate quarterly "rebates" if they satisfy certain conditions. By itself, the quarterly payment schedule makes it more difficult for Member Hospitals to extract themselves from Vizient's GPO. Second, the conditions for rebate eligibility are inherently anticompetitive because not only must a participant in one of Vizient's eleven "Traditional" ISPs[1] buy at least 75% of its total requirements for items covered by the ISP from Vizient-approved suppliers, it must also purchase at least 90% of its requirements from Vizient-approved suppliers in each discrete category covered by the specific ISP. Thus, a Member Hospital participating in Vizient's "Patient Care" ISP is only eligible for a retroactive quarterly rebate if (1) it purchased at

---

[1] The eleven traditional programs include: Airway Management, Bedside Care, Family Care, General Medical, General Surgery, Infection Prevention, Imaging, Orthopedic, Patient Care, Specialty Care, and Support Services.  Each program in turn has specific "categories" of products.  For example, the "Patient Care" ISP has a total of eleven categories of equipment (*e.g.*, adhesive tapes, bowel management, monitoring electrodes, transparent dressings, etc.)

least 75% of its "Patient Care" needs through the GPO and (2) it purchased at least 90% of its needs for each specific category within that ISP through the GPO as well.

6.      Unless competing manufacturers of quality DMS like Endure can obtain genuinely open access to Vizient's ISPs, the structure of those ISPs is anticompetitive on its face. Given Vizient's dominance in the Relevant Markets, a quality DMS producer who is denied access to relevant Vizient ISPs is effectively foreclosed from engaging in meaningful competition with Vizient's favored producers. As important, the ISPs' restrictive rebate eligibility requirements further reduce Endure's and other non-ISP producers' ability to compete because Member Hospitals must purchase at least 75% of their overall needs and 90% of their needs *in each ISP category* to be eligible for any quarterly rebates relating to that category. Under those circumstances, it is functionally impossible for Endure or other non-ISP manufacturers to gain any sort of footing for their products.[2] Because of Vizient's tight grip on access to Member Hospitals, however, DMS producers depend on Vizient's GPO for most of their DMS revenue.

7.      The ISPs also benefit Vizient by entrenching dominant, higher-priced suppliers like, for example, 3M in the "medical tape" category. As Vizient's own documents show, participation in an ISP offers producers "protection from competitive threats." Vizient not only recognizes, but actively *promotes* the anticompetitive impact of its programs, realizing that the structure of the ISPs makes it prohibitively difficult for any producer who has not been invited to the party to compete effectively. That is, through these and other anticompetitive practices and agreements, Vizient locks Member Hospitals into purchasing through Vizient so that those

---

[2] For example, hospitals participating in Vizient's "Patient Care" ISP must generally purchase at least 90% of their full requirements for medical tape from 3M, the sole Vizient-approved provider within that ISP. Given the realities of institutional purchasing, the costs associated with marketing and selling a new competing product, and a market in which the presence of insurers reduces hospital incentives to reduce prices on a line-item basis, there is little genuine opportunity for new producers to gain the footholds they would need to compete effectively unless they are granted access to the ISP.

hospitals effectively become unwilling—and functionally unable—to purchase DMS from more efficient and cost-effective suppliers like Endure. The practical effect of the ISPs is therefore to prevent Member Hospitals from purchasing outside Vizient's distribution channel since doing so would trigger a massive penalty that would cost the Member Hospital millions of dollars through missed quarterly kickbacks.

8.      The ISPs' "protection from competitive threats" has a direct and dramatic effect on the prices offered to Vizient Member Hospitals and, ultimately, to the prices passed on to patients and insurers. ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████

9.      As described in detail below, Vizient's exclusionary conduct, at a minimum, includes the following:

- Entering into *de facto* and *de jure* exclusive agreements with Member Hospitals designed to maintain Vizient's monopoly as well as the dominance of suppliers like 3M;

- Undertaking anticompetitive conduct designed to co-opt Member Hospitals into financial dependence on the substantial loyalty kickbacks tied across categories in order to extract the monopoly rents;

- Raising barriers to entry for any potential new competitors that seek to facilitate lower-cost distribution alternatives;

- Imposing unreasonable switching costs on Member Hospitals through a variety of conduct without any legitimate business justification, including through

staggered contracts, multi-product bundling, and loyalty rebates;

- Forcing, by means of the ISPs, Member Hospitals to use only one dominant supplier in a given DMS product category; and

- Strategically employing termination dates whereby each product category within the ISP has a different term.

10. As a result of this exclusionary conduct, Member Hospitals as well as patients/insures face higher prices and less choice. Indeed, by separating the ISPs' "rebates" from the list price, Vizient and dominant suppliers can structure the loyalty kickbacks so that the net-of-kickback price for each DMS product equals the monopoly price, while at the same time ensuring that the share of the market that the new entrant like Endure can reasonably contest is so small that it cannot profitably match "rebates" that would be lost.

11. Rather than compete on the merits, Vizient has engaged in unlawful practices to maintain a mega-monopoly for the supply of DMS along with dominant individual suppliers for subsets of products, while excluding from the market innovative lower-cost and higher quality suppliers like Endure. Vizient's conduct has thus distorted competition, harming consumer welfare (both of hospitals and ultimately their patients/insurers) through higher prices, lower quality, less choice, and reduced innovation relative to what a monopoly-free market could provide.

## II.   PARTIES

12. Plaintiff Endure Industries, Inc. is a New York corporation headquartered at 45 N. Fulton Street, Homer, New York 13077.

13. Defendant Vizient, Inc. is a Delaware corporation headquartered at 290 E. John Carpenter Freeway, Irving, Texas 75062. Vizient, Inc. has been served with process and has appeared. Vizient began operations in 1994 as Voluntary Hospitals of America, Inc. and was known as VHA until 2015, when VHA merged with Novation, LLC. Byron Jobe is Vizient Inc.'s treasurer, David Berry is the secretary, Tim Moore is an assistant treasurer and Kathy Beasley as

an assistant treasurer.

14.     Defendant Vizient Supply, LLC is a Delaware corporation located at 350 N. Paul, Dallas, Texas. Vizient Supply LLC has been served with process and has appeared. Vizient Supply, Inc. is managed by Byron Jobe as president, David Berry as Secretary and David Ertel as Treasurer. Each Vizient Supply, Inc. manager offices at 250 E. John Carpenter Freeway, Irving, Texas. Vizient Supply used the assumed name Novation, LLC. Vizient Supply owns the trademarks for "Novation" and "Novaplus." Vizient Supply, Inc. is a member of Vizient Source, LLC.

15.     Defendant Vizient Source, LLC is a Delaware corporate located at 290 E. John Carpenter Freeway, Irving, Texas 75062. Vizient Source, LLC has been served with process and has appeared. Vizient Source, LLC is managed by Byron Jobe as president, David Ertel as treasurer, David Berry as secretary, Kathy Beasley as assistant secretary and Tim Moore as assistant treasurer. Vizient Source, LLC used Novation Source, LLC as an assumed name until the merger of Vizient and Novation in 2015. Vizient Source provides services to Member hospitals and participates in the antitrust conduct alleged by denying Member access to Endure's lower-priced, high quality, disposable medical products. As a result, patient access is similarly denied by the actions of Vizient Source, LLC.

16.     Provista, LLC is a Delaware corporation. Its corporate headquarters are located at 250 E. John Carpenter Frwy., Irving, Texas 75062. It has been served with process as Provista Supply Chain Solutions, Inc. and has appeared. The company's 2019 Texas Franchise Tax Information Report was filed as Provista, Inc. The company is managed by Byron Jobe as board chairman.

17.     The parties share corporate headquarters at 250 E. John Carpenter Freeway, Irving, Texas. Vizient Supply, LLC has a different headquarters address, but is managed by individuals

who office at 250 E. John Carpenter Freeway. The companies are managed by some of the same individuals, as listed.

18.     A proposed Supplier Agreement was required in supplier offers submitted in response to Vizient's Request for Proposals. Each proposed supplier offer named Vizient Supply LLC, Vizient, Inc. and Provista, Inc. as parties.

### III.    CO-CONSPIRATORS

19.     Various persons, who are known and unknown to Endure, and not named as defendants in this action, have participated as co-conspirators with Defendants in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy. These include, among others, other DMS producers whose own market power and monopoly profits are protected by way of their participation in Vizient's ISPs.

### IV.    JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over Endure's antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. This Court has personal jurisdiction over each Defendant. Each Defendant is headquartered in this District. Also, each Defendant has engaged in sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both United States and Texas law such that the exercise of jurisdiction over each Defendant would comport with due process requirements.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because each Defendant maintains its principal place of business in the State of Texas and in this District, and because a substantial part of the events or omissions giving rise to Endure's claims occurred in this District. In the alternative, personal jurisdiction and venue may be deemed proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, because each Defendant may be found in or transacts

8

business in this District.

## V.    FACTS

**A.    *Endure Manufactures, Markets, Sells, and Distributes Products in the Relevant Market.***

22.    Endure is a medical device manufacturing, marketing, and distribution company founded in 2016 with the goal of producing and distributing high-quality DMS using radical price transparency as a means of lowering medical costs for hospitals, insurers, and patients. Endure is an accredited enterprise, owned by a female practicing physician of ethnically diverse heritage.

23.    Endure manufactures, distributes, markets, and sells disposable medical supplies, which constitute the least technically complex subset of all devices sold in the medical supply market. In other words, the products exhibit a high degree of interchangeability and, thus, *should* exhibit significant price sensitivity. Disposable medical supplies are one of the highest-volume sectors in the field.

24.    Endure has conducted rigorous advertising campaigns and other marketing endeavors. Vizient's ISPs have foreclosed Endure from a substantial portion of the market and Endure has been unable to compete effectively in the GPO market for DMS Vizient dominates. Endure has also been foreclosed from selling through other GPOs.

25.    Like other major DMS manufacturers, Endure produces DMS at facilities throughout the world for sale in the United States. Unlike other major DMS manufacturers, Endure is uniquely able to deliver high quality products at affordable prices to hospitals because it has streamlined the production and delivery process for disposable medical products. Endure utilizes data-driven optimization and technological automation to fine-tune every step along the sourcing pipeline—including operational logistics, inventory management and distribution.

26.    In one example of Endure's innovative approach, every surgery performed under general anesthesia at every hospital in the United States requires a disposable breathing circuit.

Endure has developed an innovative disposable breathing circuit that contains no PVC plastic, which both reduces the costs of production by 15% and generates 1600 tons less plastic medical waste a year. Due to Vizient's anticompetitive practices, Endure has been unable to sell this product to Member Hospitals.

27.     Studies show that at least 1000 Endure products, sold in bulk, are 10-50% more affordable than the lowest prices offered by Vizient and other leading GPOs.

**B.     *Access to GPO Member Hospitals is Critical for Endure's Survival.***

28.     At times relevant to the allegations in this Complaint, Endure, like all other major disposable medical product suppliers, undertook to sell DMS to hospitals through Vizient's GPO. DMS sold through GPOs account for over 96 to 98% of annual purchase of DMS.

29.     Virtually all acute-care hospitals in the United States purchase DMS through a GPO. In the United States, there are only 3 major GPOs that sell DMS: Vizient, Premier, and Healthtrust. No start-up GPO has successfully launched in more than 20 years. If a DMS supplier does not "participate" with a GPO, that supplier will receive virtually no sales orders from the hospitals that subscribe to that particular GPO.

30.     There are thousands of hospitals in the United States that purchase DMS from suppliers. However, academic medical centers and large acute care hospitals are the highest-volume purchasers of DMS. There are 210 hospitals in the United States affiliated with an academic medical center, and those hospitals operate 71% of the Level 1 Trauma Centers, 98% of the Comprehensive Cancer Centers, 69% of all Burn Units, and 63% of Pediatric Intensive Care beds in the United States. The average net patient revenue for these academic medical centers is 6.5x that of other hospitals. Similarly, the average amount that these hospitals spend on DMS dwarfs that of other hospitals. Academic medical centers and acute care hospitals therefore account for a disproportionately high share of revenue for the sale of DMS through GPOs in

10

general, and through Vizient in particular.

31.     As the largest GPO in the United States, Vizient serves 97% of the nation's academic medical centers and more than 50% of acute-care health systems. In addition, Vizient's total spend volume is more than double the next largest GPOs. Because Vizient is the dominant GPO with access to Member Hospitals who, in turn, include 97% of the country's high-volume academic medical centers, Endure cannot afford to forego access to Vizient. If Endure wanted to sell disposable medical products to Vizient Member Hospitals, Endure has no alternative but to do so through Vizient's ISP or risk those sales.[3]

32.     Industry studies confirm this dependence. According to Healthcare Supply Chain Association, over 96% of all hospitals purchase DMS through GPOs. Hospitals tend to use one GPO for DMS and rarely switch.

**C.**     *Endure Has No Alternative Besides Vizient to Reach Vizient's Member Hospitals*

33.     Vizient is the largest GPO in the United States. It serves approximately 97% of the nation's academic medical centers and more than 50% of acute-care health systems. In addition, Vizient's "spend volume" is at least double the next largest GPOs. Between 95 and 98% of Vizient's Member Hospitals participate in the ISPs discussed below.

34.     Like other new entrant DMS companies, Endure had no effective method to reach Vizient Member Hospitals that serve the vast majority of the country's acute-care hospitals, other than through Vizient. Vizient's anticompetitive conduct has undermined or eliminated competitive alternatives that Endure might otherwise utilize to connect to such hospitals.

---

[3] In one example of such dependence, in the acute-care hospital in Cortland, New York—near Endure's headquarters—surgeons were required to use a sub-optimal blood vessel sealing device, Voyant, putting patients at risk as a result of contractual obligations to Vizient. Despite multiple complaints to the purchasing department about the device, surgeons were told that the hospital had no choice but to purchase Voyant because Vizient offers no alternative device and because the hospital did not want to risk its GPO rebates.

35. Vizient's anticompetitive conduct includes co-opting their Member Hospitals through orchestrating a system of "kickbacks" or "inducements," and eliminating the threat of competition from innovative lower-cost and higher quality suppliers like Endure.

36. Most Vizient Member Hospitals are effectively "locked in" to Vizient through contracts, bundling, and anticompetitive incentives. In addition to the enormous cost a Member Hospital would face attempting to switch from Vizient to another GPO or to purchasing directly from suppliers, there is little or no incentive for hospitals to do so because Member Hospitals would be likely to lose the significant loyalty rebates provided by Vizient's ISP program significant loyalty rebates. These kickbacks are tied to multi-product bundling that requires Member Hospitals to purchase the vast majority of their DMS from Vizient. Beyond this, Vizient requires that Member Hospitals adopt and integrate Vizient-designed software to automate purchase orders to suppliers. This Vizient software effectively turns Member Hospitals purchasing systems over to Vizient's control.

37. Vizient also locks in Member Hospitals by tying the rebates to the number of purchases made through Vizient's GPO. The ISPs require a minimum number of purchases across multiple categories of disposable medical products. Vizient's own Director of Contract Services explained in a telephone conversation with Endure that the "secret sauce" of the ISPs is to ensure that Member Hospitals purchase through Vizient suppliers or to penalize those hospitals for noncompliance:

> Previously [before the ISP] like in your contract you may have a tier that is a 90% commitment tier and you have granted to the member access to that 90% commitment tier and if they don't meet that 90% commitment with you, about the worse [sic] that you can do to them is take away pricing. So, if you take away pricing on something that they are not even purchasing from you, it doesn't really upset them much.
>
> Now, you have at least the entire program to where they are not being the 90% with you, not only are they losing that pricing, not only are they losing their

rebate with you but they can potentially be losing rebates in bowel management, disposable sharps containers, monitoring electrodes and so far.

38.     In other words, unless it is part of Vizient's ISP, a new entrant like Endure cannot possibly offer a discount on a single product like medical tape or tourniquets equivalent to the total sum of kickbacks that the Member Hospital receives *for every product category within the ISPs*. In this way, Vizient has entered into agreements with Member Hospitals that require *de facto* or *de jure* exclusivity. For example, the ISPs bundled and volume-based requirements are intended to (and actually do) preserve Vizient's monopoly power by locking Member Hospitals into Vizient and disincentivizing their use of other distribution channels, regardless of the benefits. By agreeing to these bundled volume thresholds, Member Hospitals are able to secure rebates and other benefits that are paid out of the monopoly rents Vizient and its dominant suppliers like 3M extract.

**D.     *Vizient and Its Dominant Suppliers Were Motivated to Maintain Their Monopolies.***

39.     Group Purchasing Organizations came into prominence in the United States during the last two decades of the Twentieth Century, with the advent of the 1990s' prospective payment system for inpatient hospital reimbursement and the rise of managed care organizations.

40.     During that time, fee-for-service reimbursement was increasingly replaced by managed care. Because many corporations at that time saw managed care as an employee insurance cost-saving measure, hospitals began to form purchasing groups. The purpose of the groups at that time was to employ economies of scale by helping hospitals approach supply manufacturers with volume purchases.

41.     The early purpose of the GPO was to reduce procurement costs by allowing a centralized organization to accept a 3% fee in exchange for managing supply chain issues. Hospitals also sought to reduce supply costs to meet the new cost-saving demands of managed

care programs. At that time, the federal Anti-Kickback law was amended to allow GPOs to accept a 3% administrative fee from the Member hospitals.

42.    GPOs faced antitrust scrutiny early on, including from Congress. GPOs were susceptible to capture by a single supplier and sole-source agreements. But as a result of the scrutiny, GPOs began allowing multiple vendors through a bidding process. Vizient has now found a way to return to the sole-supplier model that generated antitrust scrutiny. Despite maintaining a façade of conducting a fair auction with multi-source awards, Vizient has found a way to tacitly reinstate the single-source supplier system through the ISP.

43.    Vizient now encourages competitive bidding of the percentage administrative fee under an Anti-Kickback law amendment which removes the cap when each vendor, rather than a hospital, separately negotiates a fee. But both Vizient and its dominant suppliers have ample reason to keep Vizient entrenched as a monopolist. Vizient obviously has a strong incentive to preserve its market and monopoly power, which allows it to extract supra-competitive fees.

44.    The country's largest suppliers of DMS like 3M (for medical tape) coordinate with Vizient to further entrench their hold over their own sub-markets. Vizient's ISP allows these large suppliers "protection from competitive threats." This protection, in turn, allows dominant suppliers to charge significantly higher prices to Vizient Member Hospitals than they would in a competitive market. Thus, by enabling dominant suppliers to charge higher prices to Member Hospitals, Vizient can extract higher total fees.

45.    The multi-million dollar kickbacks received by Member Hospitals under Vizient's ISPs are not treated as a "per-unit" discount to be passed on to patients, but rather as quarterly lump sum "executive savings" payments to hospital executives. Member Hospitals therefore have little incentive to ensure that prices remain low because the rebate payments do not reduce

14

the marginal cost of purchasing. Instead, the ISPs incentivize Member Hospitals to pass on the artificially inflated prices to patients/insurers while, at the same time, enabling them to monetize the purchase of DMS at a different level of the hospital organization. Put differently, the rebates paid to Member Hospitals are payouts from the supracompetitive monopoly profits that Vizient's ISP maintains for itself and for its dominant suppliers. As a result, patients/insurers (including Medicare) are saddled with higher prices for DMS in return for a reduced ability to choose among lower-priced alternatives.

E.    *The ISPs Restrain Trade and Entrench Vizient and the Dominant Suppliers' Monopolies.*

46.    To ensure that Vizient's Member Hospitals purchase solely through Vizient, Vizient developed the ISPs, which involves multi-product bundling tied to significant loyalty kickbacks, or "rebates" for Member Hospitals. Vizient's own internal documents make clear that the ISPs' true goal is to maintain its monopoly by offering Vizient and the dominant suppliers "protection from competitive threats." Between 95 and 98% of Vizient's Member Hospitals participate in the ISPs.

47.    Among other areas, the ISPs at issue here offer Member Hospitals the ability to purchase DMS as part of the Patient Care Program. This program includes 11 categories that Vizient views as inter-related: (1) Adhesive Tapes; (2) Bowel Management; (3) Disposable Patient Positioners; (4) Disposable Sharps Containers; (5) Monitoring Electrodes; (6) Nonsterile Kits; (7) Patient Care Plastic and Steel Products; (8) Patient Skin Care; (9) Transparent Dressings; (10) Urinary Catheters and RelatedProducts; and (11) Bonus: Disposable Stethoscopes.

48.    Vizient awards one (or, at most, two contracts) for each category above through the ISP bidding process. To determine which supplier to offer, Vizient examines bids submitted by potential suppliers. In evaluating such bids, Vizient looks at the proposed price, but also a host

of non-financial factors. Contracts, therefore, may be awarded to suppliers whose proposals do not offer the lowest prices. These vague, discretionary, non-financial factors—which are not defined with any specificity—include: (1) clinical quality and acceptability; (2) depth and breadth; (3) member preference; (4) service, supply, and value-added services; (5) environmentally preferred capabilities; and (6) adherence to proposed terms and conditions.

49.    After Vizient selects a winning supplier, each Member Hospital participating in the ISP sets an annual potential spend amount for each supplier in each category. If the Member Hospital meets a certain threshold within all categories across all programs (except one opt-out category within each Program), the hospital is eligible for a significant monetary rebate—usually 3 to 5%. Vizient uses the total dollar volume of a Member Hospital purchases in each of the 13 programs to determine compliance. If a Member Hospital is 75% compliant across all programs, it is eligible for quarterly rebates so long as it meets a compliance threshold of 90% in every category except the single-opt out category. That means that if a Member Hospital fails to purchase 75% of its DMS in all programs, it is not eligible for any rebates for any products.

50.    The following excerpt from a Vizient presentation shows an example of how this process creates *de facto* exclusivity with Vizient suppliers:



51.     As this presentation shows, Member Hospitals will not earn any rebates if they do not reach 75% compliance across *all categories*. Thus, Member Hospitals who fail to meet compliance goals with suppliers for one type of product—say bowel management—will lose rebates the hospitals would otherwise receive for totally separate products—such as adhesive tapes. In this way, Vizient's rebates are bundled across product categories and suppliers, thus effectively locking Member Hospitals in to making all purchases exclusively through Vizient.

52.     In effect, Member Hospitals who do not meet the Vizient-determined compliance threshold pay much higher prices. Member Hospitals who purchase outside the ISP are effectively compelled to buy additional product within the ISP to remain compliant and ensure they remain eligible for rebates on all categories of products. In practice, Vizient's "rebates" do not serve as a price decrease because those rebates—which can reach millions of dollars, and bring into question the meaning of Vizient's "member preference" criteria—are paid directly to hospital administrators. Thus, the rebates are not a discount off the product's prices, and the impact of the ISP is to decrease competition for the supply of disposable medical products.

53.     Vizient conditions supplier access to Member Hospitals on supplier acceptance of

the ISP terms through which Vizient bundles unrelated products and facilitates their sale and distribution. Vizient operates the ISP through Net Sales reports provided by each supplier. Vizient thus establishes whether a Member Hospital actually qualifies for rebates.

54.    The prices Member Hospitals pay for DMS reflect Vizient's dominant position in the market and Vizient's ability to exclude competitors. Indeed, the "protection from competitive threats" the ISP provides has a direct and dramatic effect on the price of DMS offered to Vizient Member Hospitals. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

55.    To maintain its monopoly, Vizient also undertakes efforts to discourage Member Hospitals from vetting out-of-network products and from fielding any potential competitive prices from out-of-network vendors.

56.    Vizient also employs a staggered termination date strategy, under which a hospital or supplier's termination date for each product category within a program differs. Although a typical Vizient PSA is for three years and automatically renews for two years for each product submitted, Vizient's ISP programs begin and end on different dates. These staggered terms make it nearly impossible for Member Hospitals to exit the ISP, even if they find better prices for a product in a specific product category. Thus, under Vizient's ISP, if a Member Hospital wants to

switch suppliers, it must allow each program to terminate, or risk losing massive bundled rebates on all other products.

57.    Vizient cannot justify the nakedly anticompetitive purpose of the ISPs—which it admits exists as a way to "protect" itself and its dominant suppliers from "competitive threats"—based on broad-brush efficiency justifications. In fact, the exclusionary nature of Vizient's ISPs is only made worse by the GPO's general efficiencies. Thus, far from being justified, the ISP's multi-product bundling and loyalty kickbacks penalizes, without reason, Member Hospitals who choose to purchase cheaper DMS anywhere other than through the Vizient-controlled distribution channel. If the ISP were really designed to promote efficiencies, it would focus on volume commitment and "per-unit" pricing discounts as opposed to percentage "share of purchases" and quarterly rebates. Similarly, nothing about the need for one-stop-shopping justifies penalizing Member Hospitals who are able to find better priced, higher quality substitutes for any one of the ISP's bundled categories.

58.    In reality, Vizient has designed the ISPs to ensure that new entrants like Endure cannot simply offer lower price or higher rebate as a means to convince Member Hospital to purchase, for example, its medical tape or tourniquets. Instead, Vizient has structured the ISPs such that Endure would need to offer a discount on medical tape equivalent to the *total sum of kickbacks* that the Member Hospital receives *for every product category within the ISP.* That is neither practical nor possible for Endure to do. It is also entirely inconsistent with competition on the merits. Instead, Vizient has simply stacked the deck to ensure that Member Hospitals do not purchase any products besides those offered through Vizient.

**F.**    *Vizient Competes for the Sale of Disposable Medical Suppliers with Suppliers like Endure*

59.    Vizient also competes directly with suppliers like Endure for the opportunity to distribute DMS to Member Hospitals. Vizient markets and sells its Novaplus brand to Member

19

Hospitals. Novaplus is a Vizient-owned private label brand that it uses to sell DMS directly to Member Hospitals. Suppliers pay an estimated 10-15% licensing fee to Vizient to place the Novaplus logo on their products. An example of a Novaplus product is Flexal gloves manufactured and distributed by Cardinal Health. Flexal is leading brand. Cardinal Health, however, places a Novaplus logo on Flexal glove boxes and pays Vizient a licensing fee.

60.    In the context of Vizient's Novaplus tourniquets, instead of designing an open-bid format and soliciting offers from all interested parties, Vizient makes the licensing of its brand available solely to tourniquet manufacturers that are already selling tourniquets through one of Vizient's authorized distributors. These distributors are almost all dominant suppliers that have no interest in carrying another manufacturer's tourniquet line. As a result, the tourniquet bid is essentially closed for new entrants like Endure, because Vizient has designed the tourniquet bid process for the principal purpose of selecting a manufacturer for Vizient's own Novaplus brand.

61.    Despite Endure's ability to sell tourniquets to Member Hospitals for 15% less than a Novaplus-branded tourniquet, Endure's bid to supply Member Hospitals with tourniquets through Vizient was denied. The result is, again, harm to the ultimate consumers through higher prices.

**G.    *Vizient Excluded Endure to Maintain Its Monopoly***

62.    Each product vendor who seeks to supply disposable medical products to Vizient Member Hospitals must sign a Product Supplier Agreement ("PSA"). Endure e-signed a PSA to supply medical tapes around September 16, 2019. Endure then submitted its bid proposal and samples to Vizient for medical tapes around September 20, 2019. Endure's bid provided a list of 99 types of tape together with specifications and pricing.

63.    After Vizient approved the quality of Endure's medical tapes offering, and after approving Endure's bid over multiple additional steps in the bid process, Vizient ultimately rejected Endure's bid. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

64.    Endure also sought to submit an online application for participation in the tourniquet category. Vizient's online platform accepted Endure product data for tourniquets, but for the reasons discussed above the bid was not allowed to progress toward consideration.

65.    Endure would have submitted equally competitive bids for other categories of DMS within Vizient's ISP, but was unable to given, among other things, the staggered contract dates that Vizient implemented.

66.    Thus, Vizient used the ISP program to maintain its mega-monopoly for DMS and substantially foreclosed Endure from access to Vizient's share of the hospital market for disposable medical products.

**H.    *The Relevant Markets***

i.    The GPO Market

67.    There are at least two relevant markets at issue in this case. One market is a broader market for the marketing, supply, and distribution of disposable medical supplies by means of GPOs to acute-care hospitals and academic medical centers. This market is defined below as the "GPO Market." Within the GPO Market, Vizient enjoys an anticompetitive island unto itself—a

submarket defined below as the "Vizient Submarket."

68.     The commercial realities of the sale and distribution of DMS mean that there are practically no interchangeable substitutes for acute care and academic hospitals to DMS (like medical tapes and tourniquets) except through GPOs. Acute care and academic medical center hospitals cannot afford to forego purchasing such DMS through GPOs because it is cost-prohibitive for Member Hospitals to switch to another method of supply. Similarly, because GPOs market, supply, and distribute DMS to virtually all acute-care hospitals and academic medical centers, Endure has no alternative but to do so through a GPO or risk those sales.

69.     Acute care and academic medical center hospitals purchase almost entirely through GPOs. Because of internal policies and additional services offered by GPOs, acute-care hospital customers (especially the high-value academic hospitals) do not view other methods of purchasing disposable medical supplies to be reasonable substitutes. Accordingly, so long as acute-care hospitals and/or academic medical centers remain locked into GPOs, other distribution channels are not reasonable alternatives.

70.     Prices of disposable medical supplies sold through GPOs are not meaningfully constrained by the price of alternative distribution methods. Due to the actions alleged here, were an acute-care hospital or an academic medical center to face an increase in prices for disposable medical products sold through a GPO, it would have no ability to shift to an alternative method of distribution. GPOs and the dominant suppliers that sell through them, on the other hand, are able profitably to increase the prices charged to acute-care hospitals and academic medical centers for DMS.

71.     Furthermore, acute-care hospitals and academic medical centers consider the purchase of DMS through a GPO to be a unique and essential channel for the efficient distribution of their products. It would be prohibitively expensive for acute-care hospitals and academic

medical centers to directly access suppliers and manufacturers, and vice-versa. GPOs offer acute-care hospitals and academic medical centers a range of options which, among other things, allow those hospitals to provide estimates of their product needs in advance. GPOs also allow hospitals buy DMS in large volumes, so that shipping cost per item is minimized. Finally, GPOs offer acute-care hospitals and academic medical centers one-stop shopping for multiple types of disposable medical products.

72.     The geographic scope of the GPO Market is the United States. GPO-distributed disposable medical products tend to be localized by country due to differences in regulations and approvals related to the use of those products with patients.

ii.     The Vizient Submarket

73.     Within the GPO Market, a narrower market definition—or submarket—is the marketing, supply, and distribution of disposable medical supplies by means of Vizient to Vizient Member Hospitals (the "Vizient Market").

74.     The commercial realities of the sale and distribution of disposable medical products mean that there are practically no interchangeable substitutes for Member Hospitals to DMS except through Vizient. Vizient's practices have created this submarket, in which Vizient houses both the demand and the supply of DMS. Vizient's ISPs effectively lock in Member Hospitals to purchasing DMS exclusively through Vizient. Member Hospitals therefore cannot afford to forego purchasing such DMS through Vizient because it is cost-prohibitive for Member Hospitals to switch to a new GPO. In addition to the ISPs, Vizient requires that Member Hospitals adopt and integrate Vizient-designed software to automate purchase orders to suppliers. This Vizient software effectively turns Member Hospitals purchasing systems over to Vizient's control.

75.     There are thousands of hospitals in the United States that purchase DMS.

Academic medical centers and large acute care hospitals are the highest-volume purchasers of DMS. For example, there are 210 hospitals in the United States affiliated with an academic medical center, those hospitals operate 71% of the Level 1 Trauma Centers, 98% of the Comprehensive Cancer Centers, 69% of all Burn Units, and 63% of Pediatric Intensive Care beds in the United States. For this reason, the average net patient revenue for academic medical centers is 6.5x that of other hospitals. Similarly, the average amount that these hospitals spend on DMS dwarfs that of other hospitals. Academic medical centers and acute care hospitals therefore account for a disproportionately high share of revenue for the sale of DMS through GPOs in general, and through Vizient in particular.

76.     As the largest GPO in the United States, Vizient serves 97% of the nation's academic medical centers and more than 50% of acute-care health systems. In addition, Vizient's total spend volume is more than double the next largest GPOs. Because Vizient is the dominant GPO with access to Member Hospitals who, in turn, include 97% of the country's high-volume academic medical centers, Endure cannot afford to forego access to Vizient. If Endure wanted to sell disposable medical products to Vizient Member Hospitals, Endure has no alternative but to do so through Vizient's ISP or risk those sales.

77.     Because of this, Vizient can, and does, coordinate with dominant suppliers to raise the price of the DMS to Member Hospitals through its programs to supracompetitive levels without fear of losing revenue from Member Hospitals switching to other GPOs. In other words, Vizient's ISPs have ensured that DMS suppliers through non-Vizient's channels—including through other GPOs—are not a substitute for suppliers who offer those same products Vizient's ISPs.

78.     Due to the ISPs, Vizient Member Hospitals almost all use only Vizient providers for DMS and they rarely, if ever, switch to another GPO. Because of internal policies and

additional services offered by Vizient, Vizient Member Hospitals (especially the high-value academic hospitals) do not view other methods of purchasing DMS to be reasonable substitutes. Accordingly, so long as acute-care hospitals remain locked into Vizient, other distribution channels are not reasonable alternatives.

79.      As described above, prices of DMS sold through Vizient are not meaningfully constrained by the price of alternative distribution methods. Due to the actions alleged here, were Vizient Member Hospitals to face an increase in prices for DMS sold through Vizient, those hospitals would have no ability to shift distribution to an alternative method of distribution. Vizient, and the dominant suppliers that sell through it, on the other hand, are able profitably to increase the prices charged to Vizient Member Hospitals.

80.      Furthermore, Vizient Member Hospitals consider the purchase of DMS through Vizient to be a unique and essential channel for the efficient distribution of their products. It would be prohibitively expensive for Vizient Member Hospitals to directly access suppliers and manufacturers, and vice-versa. Vizient Member Hospitals value certain superficial benefits offered by Vizient which, among other things, allow those hospitals to provide estimates of their product needs in advance. Vizient also allow its Member Hospitals to buy DMS in large volumes.

81.      The geographic scope of the Relevant Market is the United States. Vizient-distributed DMS tend to be localized by country due to differences in regulations and approvals related to the use of those products with patients.

**I.      *Vizient's Monopoly Power***

82.      The GPO Market is highly concentrated in the United States, with only 3 major market participants accounting for 90% of the total annual spend on DMS. Vizient is, by far, the largest, with a total annual spend that is more than double its next largest competitor. As discussed above, Vizient serves 97% of the academic medical centers and more than 50% of the

acute care hospitals, including the some of the country's largest acute care hospitals. Thus, on information and belief, Vizient accounts for over 70% of the total spend on DMS through GPOs in the United States.

83.     Vizient's market share is also increasing. In 2021, it completed the acquisition of Intalere—then, the country's fourth largest GPO. According to Vizient, the purpose of the Intalere acquisition was to, among other things, increase Vizient's access to high volume academic medical centers and health systems. Over the last five years, the market shares of Vizient's two remaining GPO competitors have decreased, while Vizient's has increased.

84.     The Relevant Markets defined herein have significant and lasting barriers to entry that serve to protect the monopoly power of Vizient. Among other things, a new market entrant would face several barriers to entry including the costs and length of time required to establish relationships and negotiate agreements with suppliers and acute care hospital and/or academic medical centers, which are generally operating under multi-year contracts with existing GPOs and which incur significant costs in converting to a new GPO.

85.     Vizient has also acted to raise barriers to entry for potential competitors. Indeed, it has reinforced and raised the high switching cost that must be overcome before a Member Hospital acts to purchase disposable medical products through a channel of distribution other than Vizient. Specifically, as discussed above, Vizient locks in Member Hospitals through multi-product loyalty rebates and staggered contracts, in an effort to raise and reinforce the barriers to entry in order to protect its monopoly from competitors. In particular, Vizient has erected substantial barriers to entry by more efficient and less expensive suppliers of disposable medical products like Endure. Vizient has structured the ISPs such that Endure would need to offer a discount on medical tape or tourniquets or another competitive product equivalent to *the total sum of kickbacks* that the Member Hospital receives *for every product category within the ISP.* That is

neither practical nor possible for Endure to do. Other barriers to entry include access to capital, supply chain logistics, GPO application costs, and GPO exclusion, all of which limit disposable medical product market participants. As a result of these barriers to entry and Vizient's conduct and agreements, no new GPOs have successfully entered the United States market for over 20 years.

86.    Beyond this, given the practices described above, Vizient has the power to control prices in the Relevant Markets. It can, and does, profitably raise or maintain prices of DMS sold to acute care and/or academic medical centers substantially above the competitive level for a significant period of time. For example, Vizient uses non-price factors in order to maintain supracompetitive prices for those products. Vizient's ability to keep the total amount of its fees high over an extended period of time, while the cost of many of its inputs have been reduced dramatically over time, is direct evidence of its monopoly power.

87.    Through the ISPs and staggered contracts, Vizient has the ability to exclude competition from the Relevant Markets. As a result, Vizient possesses market power in the GPO Market and the Vizient Market

**J.    *Vizient's Foreclosed a Substantial Portion of Competition in the Relevant Market.***

88.    The practical effect of Vizient's challenged conduct is to prevent Member Hospitals from purchasing from more efficient DMS from innovative and lower-priced suppliers like Endure. Doing so would trigger a massive penalty and cost the Member Hospital millions of dollars in decreased incentive payments. Accordingly, the principal anticompetitive effect of Vizient's challenged conduct has foreclosed more efficient DMS suppliers, including Endure, from participating in the Relevant Markets.

89.    Endure does not manufacture an equally diverse group of products as Vizient offers to its Member Hospitals through the ISPs, and therefore Endure cannot make a comparable

offer to Member Hospitals. Vizient's challenged practices thus bar a substantial number of DMS suppliers from participating in the Relevant Markets.

90.    Furthermore, even if other means of distribution remain a theoretical possibility (like selling directly to a Member Hospital), Vizient's efforts to foreclose efficient DMS suppliers like Endure from the means of distribution that are the most cost effective has the inevitable effect of increasing costs and prices, thus hampering Endure's practical ability to compete.

91.    The ISPs' methods of foreclosure are even more insidious than typical bundling discounts—which, on their own and even without Vizient's other anticompetitive practices, can generate antitrust liability—because they bundle together DMS from many different dominant suppliers in multiple categories. As a result, each supplier participating in the ISP "protects" other suppliers from "competitive threats." In other words, by combining multiple dominant suppliers within the ISP, Vizient allows each dominant supplier to benefit from the market power of the other suppliers. Vizient's ISP structure mutually reinforces dominant suppliers and enables Vizient to obtain supracompetitive fees at the expense of equally efficient competitors like Endure. To overcome such an artificial aggregation of market power, Endure would have to offer discounts equaling a substantial multiple of the rebates paid by the dominant suppliers who are part of the ISP.

92.    Given that 95 to 98% of Vizient Member Hospitals participate in the ISP, the aggregate market foreclosure in the relevant market is substantial.

**K.    *Harm to Competition and Damages***

93.    The unlawful agreements and acts described above have had at least the following effects:

- Restraining, suppressing, and eliminating competition in the relevant markets;
- Artificially raising, stabilizing, and maintaining at high and supracompetitive

28

levels prices charged by Vizient to Member Hospitals; and

- Directly and proximately injuring and financially damaging Endure in its businesses and property, in amounts to be proved at trial.

94.      The harm to competition includes increased costs of DMS above the competitive level which are paid by Member Hospitals, increased prices charged to Member Hospitals and end user patients for DMS and otherwise stifled competition.

95.      The harm to competition also includes the reduced choice and increased price that patients face as a result of the ISPs' restrictions. Because Vizient's ISPs do not treat kickback payments as "per-unit" discounts that would reduce the marginal cost of purchasing, Member Hospitals ultimately have little incentives to offer alternative products or ensure that prices for disposable medical products remain low. The ISPs therefore impose higher prices for disposable medical products in exchange for a reduced ability to choose among any lower-priced alternatives.

96.      Harm to competition on the hospital side of the platform includes the percentage fee absorbed by Member Hospitals for volume of purchased Novaplus brand, for which suppliers pay a direct fee to Vizient. This increased cost to Member hospitals has led to prices above the competitive level.

97.      In addition, the harm to competition includes increased non-price costs of marketing, selling and distributing disposable medical products to hospitals above competitive levels, such as the increased cost imposed on ISP suppliers both in fees paid to Vizient and in rebates paid to Member hospitals. The ISP suppliers must also compete with the Novaplus brand, which is exempt from ISP costs.

98.      Harm to competition on the supplier side of the platform is the undisclosed or vaguely disclosed non-price factors considered by Vizient for access to the platform related to

disposable medical products, which are largely interchangeable and are not generally differentiated on a basis other than price. The non-price factors stifle competition among disposable medical product suppliers by raising the cost of competition.

99.     Vizient's anticompetitive conduct has relaxed the constraints that competitors' entry and expansion would otherwise impose on product choice and all-in prices in the Relevant Markets.

100.     By impairing Member Hospitals' freedom of choice for competitors' DMS through imposition of penalties, Vizient controls Member Hospitals' demand for those products, reduces competitors' sales and margins, and diminishes competitors' ability and incentive to invest and innovate.

101.     Vizient's exclusionary and anticompetitive practices as described in this Amended Complaint are not reasonably necessary to accomplish any significant procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and Vizient reasonably could achieve any procompetitive goals through less restrictive alternatives.

102.     Competition often drives firms to innovate in next-generation methods. Enhanced innovation in the disposable medical product market largely includes efficiencies in production and developments that lead to cost savings. By suppressing innovation, Vizient's anticompetitive practices threaten these benefits.

103.     Endure was damaged monetarily as a proximate result of Vizient's conduct.

104.     As a direct and proximate result of Vizient's wrongful conduct, Endure was required to retain counsel and incurred reasonable and necessary attorneys' fees and costs.

**L.     *Vizient Is Also A Two-Sided Transaction Platform.***

105.     Alternatively, Vizient markets, sells and distributes DMS as a two-sided transaction platform.

106.    One side of the platform facilitates transactions from suppliers, which market, sell and distribute disposable medical products to Member Hospitals through Vizient, Inc., Vizient Supply, and Provista.

107.    Suppliers pay Vizient an administrative fee for performing this function which is based upon volume of sales. Each supplier seeking inclusion in the ISP competitively bids the administrative fee percentage payable to Vizient.

108.    Suppliers pay to Vizient the rebates attributable to Member Hospital disposable medical product sales. Vizient monitors Member Hospital compliance with the ISPs and disburses rebate payments.

109.    Vizient's revenue for performing the supplier side of the platform includes the private label fee Vizient charges competing suppliers for the Novaplus label. The estimated 10-15% private label licensing fee enables the Novaplus supplier to bypass the bidding process and directly market, sell and distribute disposable medical products to Member hospitals.

110.    Thus, the price charged by Vizient on each product for the supplier side of the platform is discounted by rebates on all products, the Vizient administrative fee and the Novaplus licensing fee. The rebates, administrative fee and licensing fee should be considered in applying variables such as incremental costs, discount attribution, incremental revenue and contestable portion of market share.

111.    Recoupment is made using artificially bolstered demand across all products in addition to data related to rebate accounting.

112.    Alternatively, the ISPs restrict rival sales by bundling each Member Hospital's contestable demand for the DMS units the Member Hospital is willing to switch to rival products. The ISPs make it costly to switch from the Vizient designated DMS suppliers to Endure despite Endure's lower price. Substantial market foreclosure results.

31

113.    The Member Hospital side of the platform facilitates marketing, sales and distribution of disposable medical products from Vizient Chosen Suppliers to Member hospitals through entities which include Vizient, Inc., Vizient Source and Provista.

114.    Member Hospitals do not pay a fee for Vizient's services. Instead, the Vizient transaction platform is funded by the supplier-paid administrative fees which are based on sales volume of Member Hospitals' purchases and Novaplus licensing fees.

115.    Member Hospitals pay for Vizient's services, through the above-market list prices paid for DMS.

**COUNT I—EXCLUSIVE DEALING**
**Monopolization of the Vizient Market**
**Sherman Act, 15 U.S.C. § 2**

116.    Plaintiff repeats the allegations above as if fully set forth herein.

117.    Vizient possesses monopoly power in both the Vizient Submarket and the GPO Market. Through the anticompetitive conduct described herein, Vizient has willfully maintained that power by anticompetitive and unnecessarily exclusionary means.

118.    With a significant share of the GPO Market and a nearly 100% share of the Vizient Market–both markets with high barriers to entry through unlawful contracts and other conduct described herein—Vizient possesses monopoly power. In addition, Vizient's monopoly power is demonstrated directly by its actual exercise of power over price and related contractual terms, and by its actual exclusion of nascent, more-efficient, less-expensive competitors from the market. Finally, Vizient's monopoly power in the Vizient Submarket is further enhanced by the strength of its position in the GPO Market, where it enjoys monopoly power.

119.    As described above, Vizient continues to dominate that broader GPO Market by controlling, on information and belief, at least over70% percent of spend volume of DMS through GPOs to acute-care hospitals and academic medical centers. Thus, suppliers like Endure must sell

32

disposable medical products through Vizient to reach a broad set of acute-care hospitals.

120. The exclusionary agreements and related conduct described in this complaint illegally entrench and maintain Vizient's monopoly. As described above, Vizient's exclusionary conduct and agreements impair competition in an unnecessarily restrictive way that does not further competition on the merits. It has repeatedly attempted and succeeded in excluding rivals and potential rivals on a basis other than efficiency, through numerous instrumentalities including:

- Contractual restraints that insulate its monopoly power by expressly forbidding entry or raising potential rivals' costs of entry to the point of non-viability;

- Agreements between Vizient and acute-care hospitals that lock the latter into the Vizient's platform and raise the costs of switching to an existing or potential competitor; and

- Entering into agreements with acute-care hospitals that reinforced Vizient's ability to extract monopoly rents from Member Hospitals, and stifled smaller disposable medical product suppliers' attempts to compete

121. Vizient's actions to raise and maintain barriers to entry, to exclude nascent competition, to delay development, and to impose the contractual terms discussed above are exclusionary and serve to maintain Vizient's monopoly. Its conduct enabled it and its dominant suppliers to charge supracompetitive prices, even accounting for incentive payments. Those are classic harms to competition, and they indicate that Vizient's practices were and are reasonably capable of contributing materially to Vizient's maintenance of monopoly power in the GPO Supply Market and the Vizient Submarket.

122. Vizient has acted with an intent to maintain its monopoly power illegally in the Vizient Submarket and the GPO Market, and its unlawful conduct has enabled it do so, in violation of Section 2 of the Sherman Act.

123. As Vizient intended, Endure has been injured in its business property by reason

of this conduct and is therefore entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Endure has suffered injury-in-fact as a result of Vizient's exclusionary conduct.

124.    The foreclosed market share in each or every relevant product line is substantial.

## COUNT II – UNILATERAL REFUSAL TO DEAL
### Monopolization of the Vizient Market
### Sherman Act, 15 U.S.C. § 2

125.    Plaintiff repeats the allegations above as if fully set forth herein.

126.    Vizient possesses monopoly power in both the Vizient Submarket and the GPO Market. Through the anticompetitive conduct described herein, Vizient has willfully maintained that power by anticompetitive and unnecessarily exclusionary means.

127.    With a significant share of the GPO Market and a nearly 100% share of the Vizient Market—both markets with high barriers to entry through unlawful contracts and other conduct described herein—Vizient possesses monopoly power. In addition, Vizient's monopoly power is demonstrated directly by its actual exercise of power over price and related contractual terms, and by its actual exclusion of nascent, more-efficient, less-expensive competitors from the market. Finally, Vizient's monopoly power in the Vizient Submarket is further enhanced by the strength of its position in the GPO Market, where it enjoys monopoly power.

128.    Vizient has refused to deal with a competitor for the purpose of creating or maintaining a monopoly.

129.    Vizient's offer to deal with Endure, a competitor, is on only unreasonable terms and conditions.

130.    Vizient has refused to provide Endure with services that were already sold in a market to other customers.

131.    Vizient's refusal to deal with Endure is be motivated "solely by anticompetitive

34

intent," because Endure's products offer a superior price/quality than Vizient's favored suppliers.

132.    Vizient's refusal to deal is contrary to Vizient's short-run best interests but makes sense for Vizient only because it harms competitors and helps Vizient in the long run. Vizient has acted with an intent to maintain its monopoly power illegally in the Vizient Submarket and the GPO Market, and its unlawful conduct has enabled it do so, in violation of Section 2 of the Sherman Act.

133.    As Vizient intended, Endure has been injured in its business property by reason of this conduct and is therefore entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Endure has suffered injury-in-fact as a result of Vizient's exclusionary conduct.

134.    The foreclosed market share in each or every relevant product line is substantial.

**COUNT III—ESSENTIAL FACILITIES**
**Monopolization of the Vizient Market**
**Sherman Act, 15 U.S.C. § 2**

135.    Plaintiff repeats the allegations above as if fully set forth herein.

136.    Vizient possesses monopoly power in both the Vizient Submarket and the GPO Market. Through the anticompetitive conduct described herein, Vizient has willfully maintained that power by anticompetitive and unnecessarily exclusionary means.

137.    With a significant share of the GPO Market and a nearly 100% share of the Vizient Market—both markets with high barriers to entry through unlawful contracts and other conduct described herein—Vizient possesses monopoly power. In addition, Vizient's monopoly power is demonstrated directly by its actual exercise of power over price and related contractual terms, and by its actual exclusion of nascent, more-efficient, less-expensive competitors from the market. Finally, Vizient's monopoly power in the Vizient Submarket is further enhanced by the strength of its position in the GPO Market, where it enjoys monopoly power.

138.    As described above, Vizient continues to dominate that broader GPO Market by controlling, on information and belief, at least 70% percent of spend volume of DMS through GPOs to acute-care hospitals and academic medical centers. Thus, suppliers like Endure must sell DMS through Vizient to reach a broad set of acute-care hospitals.

139.    Vizient controls a facility that is essential to effective competition in the relevant market.

140.    The facility could not practically or economically be duplicated by potential competitors.

141.    It is feasible for Endure to participate without interfering with or significantly inhibiting Vizient's ability to conduct its business.

142.    Denying reasonable access to Endure is contrary to Vizient's independent business interests.

143.    Vizient's refusal to grant Endure reasonable access had the effect of creating or maintaining monopoly power.

144.    As Vizient intended, Endure has been injured in its business property by reason of this conduct and is therefore entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Endure has suffered injury-in-fact as a result of Vizient's exclusionary conduct.

145.    The foreclosed market share in each or every relevant product line is substantial.

### COUNT IV
### Vertical Agreements by Vizient in Restraint of Trade
### Sherman Act, 15 U.S.C. §§ 1, 2

146.    Plaintiff repeats the allegations above as if fully set forth herein.

147.    As described above, Vizient has entered into a series of agreements with Member Hospitals and dominant suppliers like 3M that, taken separately and/or together, unreasonably restrain competition in that market. These restrictions diminish and eliminate any competitive

36

threat to Vizient's market power in the GPO Market and the Vizient Submarket.

148.    Through these agreements, Vizient has restricted the ability of non-dominant suppliers like Endure to sell DMS through more efficient distribution channels.

149.    By imposing its restraints, Vizient has insulated itself from competition with other GPO and non-GPO distribution methods.

150.    Alternatively, Vizient is a two-sided transaction platform.

151.    Vizient harms competition on each side of the platform.

152.    As a proximate result of Vizient's wrongful conduct, Endure incurred monetary damages in amount to be determined by the Court and trebled by law.

**COUNT V**
**Attempted Monopolization**
**Sherman Act, 15 U.S.C. § 2**

153.    Endure incorporates paragraphs 1-209 as if fully set forth as part of this Count IV.

154.    Vizient engaged in overt acts of anticompetitive conduct as set forth in this Complaint.

155.    Vizient had a specific intent to monopolize as shown by Vizient's purchase of competing GPOs, a program which drives market share, and direct evidence of the ISPs' goal to provide "protection from competitive threats and rebidding."

156.    Vizient had a dangerous probability of achieving monopoly power as shown by its aggressive increase in market share, its ability to control price and to artificially bolster demand in the relevant market.

157.    As a proximate result of Vizient's wrongful conduct, Endure incurredmonetary damages as determined by this Court and trebled by law.

**COUNT VI**
**Conspiracy to Monopolize**
**Sherman Act, 15 U.S.C. § 2**

37

158.    Endure incorporates paragraphs 1-209 as if fully set forth as part of this Count IV.

159.    Endure alleges that Vizient and one or more dominant supplier knowingly entered into an agreement or mutual understanding to obtain or maintained monopoly power.

160.    Vizient specifically intended that one of the parties to the agreement obtain or maintain monopoly power.

161.    Vizient committed an overt act in furtherance of the conspiracy.

162.    Endure was injured in its business or property by Vizient's anticompetitive conduct.

163.    As a proximate result of Vizient's wrongful conduct, Endure incurred monetary damages as determined by this Court and trebled by law.

## COUNT VII
### Declaratory Judgment 28 U.S.C. § 2201

196.    Endure incorporates paragraphs 1-209 as if fully set forth as part of this Count V.

197.    An actual controversy exists between Vizient and Endure regarding whether Vizient violated the antitrust laws.

198.    The district court has authority to declare the rights and legal relations of each party hereto.

## COUNT VIII
### Injunctive Relief

199.    Endure incorporates paragraphs 1-209 as if fully set forth as part of this Count VI.

200.    Endure has pled at least one cause of action against Vizient.

201.    Endure has a substantial likelihood of success on the merits of its claims.

202.    There is a substantial threat the Endure will suffer irreparable harm if an injunction is not granted.

203.    Endure's threatened injury outweighs any threatened harm to Vizient if an

injunction is granted.

204.    Granting preliminary and/or permanent injunctive relief will not disserve the public interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Endure Industries, Inc. respectfully requests that this Court, as authorized by 15 U.S.C. § 26, 15 U.S.C. §15, Federal Rule of Civil Procedure 65, 28 U.S.C. § 2202 and pursuant to its own equitable powers, enter final judgment in favor of Endure and against Vizient, jointly and severally:

   a.    Declaring that Vizient violated the antitrust laws against Endure.

   b.    Preliminarily enjoining Vizient from engaging in its unlawful conduct;

   c.    Permanently enjoining Vizient from engaging in its unlawful conduct;

   d.    Permanently enjoining Vizient from engaging in similar and related conduct in the future;

   e.    Awarding monetary damages which are trebled as allowed by law;

   f.    Awarding reasonable and necessary attorneys' fees and costs to Endure; and

   g.    Granting any additional relief at law or in equity to which Endure justly may be entitled.

## JURY DEMAND

Plaintiff Endure Industries, Inc. hereby demands a trial by jury on all issues so triable.

Dated:  January 28, 2022

By   */s/ Christopher W. Patton*

Christopher W. Patton
State Bar No. 24083634
cpatton@lynnllp.com
Andrés Correa
State Bar No. 24076330
acorrea@lynnllp.com
Ruben Garcia
State Bar No. 24101787
rgarcia@lynnllp.com
Cory Johnson
State Bar No. 24046162
cjohnson@lynnllp.com

**LYNN PINKER HURST &
SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
Telephone: 214-981-3800
Facsimile: 214-981-3839

*Attorneys for Plaintiff Endure Industries,
Inc.*