THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ENDURE INDUSTRIES, INC. | § § § § § § § § § § § | |
| Plaintiffs, | | |
| v. | | CIVIL ACTION NO. 3:20-cv-3190-X |
| VIZIENT, INC., VIZIENT SUPPLY, LLC, VIZIENT SOURCE, LLC, and PROVISTA INC. | | |
| Defendants. | | |

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITIES**

Plaintiff Endure Industries, Inc. ("Endure" or "Plaintiff") alerts the Court of a decision issued after Endure filed its responses to Defendants' *Daubert* and summary judgment motions. On August 5, 2024, the U.S. District of Court for the District of Columbia issued *United States v. Google LLC*, No. 20-CV-3010 (APM), -- F. Supp.3d --, 2024 WL 3647498 (D.D.C. Aug. 5, 2024) (attached as Exhibit A) ("Google Opinion"). This submission is not meant to describe the entire (and very lengthy) Google Opinion or argue any motion, but only to highlight particularly salient analysis and holdings.

In the Google Opinion, the District Court—which quotes an article by Loren K. Smith, Endure's relevant market expert in this case[1]—addresses a number of issues relevant to this case. To prove that "Google has engaged in exclusionary conduct," the

---

[1] Google Opinion at 149-150 (quoting Kevin Hahm & Loren K. Smith, *Clarifying Bundle Markets and Distinguishing Them From Cluster Markets*, 20 ANTITRUST SOURCE 1, 3 (2021).

Plaintiffs focused "on the search [engine] distribution contracts—the browser agreements (primarily with Apple and Mozilla) and the Android agreements . . . which Google allegedly uses to maintain its monopoly in the relevant markets." *Id.* at 197. As a result, most of the Court's analysis relevant to this case relates to how Google's contracts constitute exclusionary, anticompetitive activity. *See generally id.* 2-3 ("Google pays huge sums to secure these preloaded defaults. Usually, the amount is calculated as a percentage of the advertising revenue that Google generates from queries run through the default search access points."). Similarly, Endure attacks Vizient's contracts with suppliers here.

       1.    ***"'Competition for the Contract' Is No Defense."*** Google responded that it secured its default search browser contracts "through competition as opposed to exclusionary conduct." *Id.* 199.  *Cf.* Doc. 236 at 7 (Vizient arguing "[i]t selects suppliers for its GPO members through an open, transparent, and competitive bid process"). The Court responded that Google's history of competing for contracts through quality and innovation is "not inconsistent with possessing and exercising monopoly power." *Id.* 200. *See also id.* at 202 ("[T]his case is not about [Google's] initial acquisition of monopoly power. It is about [Google's] efforts to maintain this position through means other than competition on the merits."[2]). "[O]ver the last decade, Google's grip on the market has only grown stronger," showing evidence of "market stasis." *Id.*  "Google understands there is no genuine competition for the [default contracts] because ***it knows that its***

---

[2] Quoting *United States v. Microsoft*, 253 F.3d 34, 56 (D.C. Cir. 2001).

*partners cannot afford to go elsewhere*. Time and again, Google's partners have concluded that it is *financially infeasible to switch* . . . or seek greater flexibility in search offerings" because it would mean sacrificing the millions "Google pays them as revenue share." *Id*. 201 (emphasis added). As one executive testified, the Google payments "provide an incredibly strong incentive for the ecosystem to not do anything." *Id*.

The same is true here. *See, e.g.*, Doc. 255 at 3, 12 (noting 98%-member retention rate and quoting Vizient presentation as saying "[m]ost members, including some of our largest most sophisticated members, do not make a move without looking at how it'll affect their Impact rebates," and that "members can change suppliers during the program, but that is not typical once they standardize"). "Like Microsoft before it, Google [and now Vizient] has thwarted true competition by foreclosing its rivals from the most effective channels of search distribution." *Id*. at 202.

2. ***De facto* and partial exclusivity**. The Google Opinion confirms that "[e]xclusivity need be neither express nor complete to render an agreement 'exclusive' for Section 2 purposes: *De facto* and partial exclusivity may suffice depending on the circumstances." *Id.* at 204 (quoting *Microsoft*, 253 F.3d at 75-76. Google made a number of arguments. <u>First</u>, Google argued that its contracts permit the browser to promote search rivals. "[T]he mere fact that the browser agreements do not prevent Apple and Mozilla from entering into limited distribution deals with rivals does not render the agreements non-exclusive." *Id*. at 206. The Court quoted *Microsoft* for the same notion that Endure did: the agreements at issue "for all practical purposes" guarantee the monopolist will be the customer's choice, because the monopolist is using one of the "major channels of

distribution and keeping a competitor "below the critical level necessary" to pose a real threat. *Id.* at 206 (quoting *Microsoft*, 253 F.3d at 53, 67, 68).

Second, Google argued that Apple could pre-load a different search application or browser on its devices. The Court responded that "market realities matter more than what is theoretically possible." *Id.* at 207. "So, even though the [contract] contains no express exclusivity provision, its terms in combination with Apple's established business practices means that Google will be the only [search engine] preloaded on an Apple device. That makes it exclusive." *Id.* (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003) (Section 2 liability encompasses "arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors.")).

Third, Google argued that user choice mattered more than the default search engine agreed-to in the contracts, and that users used non-default search access points. But "the fact that some consumers access search on non-default access points is not dispositive on exclusivity." *Id.* at 208. The Court looked at where the "substantial amount of distribution" was. *Id.* The Court went on, "To be deemed exclusive, a contract need not foreclose all other avenues of distribution to which consumers might have access. It is enough that the contract 'clos[es] to rivals a substantial percentage of the available opportunities for [] distribution.'" *Id.* (quoting *Microsoft*, 253 F.3d at 70).

Fourth, Google argued that the contracts permitted users to access rival search engines. "[B]ut they rarely do." *Id.* at 209. The Court considered the evidence on whether users actually accessed rival search engines, not just the contract's mere permission to do so. "The mere existence of other avenues of distribution is insufficient without an

assessment of their overall significance to the market." *Id*. (quoting *United States v. Dentsply*, 399 F.3d 181, 196 (3d Circ. 2005).

Here, Vizient argues "there is nothing exclusive about the Impact Program" because it is "voluntary," Doc. 236 at 4, and Endure responds that "the structure and effect of Vizient's programs are contracts are de facto, if not expressly, exclusionary," Doc. 255 at 40. The Google Opinion, and the evidence, supports Endure. As stated in the Google Opinion, "antitrust policy should not differentiate between the manufacturer of widgets that explicitly imposes exclusive dealing on its dealers and the manufacturer that gives such dealers a discount ***or rebate*** for dealing exclusively in the manufacturer's widgets," because both "have the 'practical effect' of inducing exclusive dealing." *Id*. at 213 (quoting Areeda & Hovenkamp, ANTITRUST LAW ¶ 1807b (5th ed. 2022) (quotation omitted)) (emphasis added).

3.  ***The standard regarding anticompetitive effects***. The Google Opinion recognized that exclusionary contracts only "run afoul of the antitrust laws when used by a dominant firm to maintain its monopoly." Google Opinion at 215 (citation omitted). To determine whether exclusionary contracts have such an "anticompetitive effect," "[t]he plaintiff is not required to show that but for the defendant's exclusionary conduct the anticompetitive effects would not have followed." *Id*. at 216. "The key question then is this: Do Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market?" *Id*. In that case, the answer was yes. Google's contracts have three "primary anticompetitive effects: (1) market foreclosure, (2) preventing rivals from

achieving scale, and (3) diminishing the incentives of rivals to invest and innovate in general search." *Id*.

Importantly to this case with respect to foreclosure, the Court explained that there may still be market foreclosure even "when a dominant firm leave *some* alternative ways for customers to access rivals." *Id*. at 221 (emphasis in original). Also relevant here, the Court noted that "[t]he absence of meaningful rebidding further aggravates the foreclosure effects." *Id*. at 225. *Cf*. Doc. 255 at 8 (highlighting Vizient's internal offer to suppliers of "Protection from competitive threats and ***rebidding***").

Dated: August 21, 2024　　　　　　　By  */s/ Andres Correa*
　　　　　　　　　　　　　　　　　　　Christopher W. Patton
　　　　　　　　　　　　　　　　　　　State Bar No. 24083634
　　　　　　　　　　　　　　　　　　　cpatton@lynnllp.com
　　　　　　　　　　　　　　　　　　　Andrés Correa
　　　　　　　　　　　　　　　　　　　State Bar No. 24076330
　　　　　　　　　　　　　　　　　　　acorrea@lynnllp.com
　　　　　　　　　　　　　　　　　　　Greg Brassfield
　　　　　　　　　　　　　　　　　　　State Bar No. 24079900
　　　　　　　　　　　　　　　　　　　gbrassfield@lynnllp.com
　　　　　　　　　　　　　　　　　　　Jamie R. Drillette
　　　　　　　　　　　　　　　　　　　State Bar No. 24105820
　　　　　　　　　　　　　　　　　　　jdrillette@lynnllp.com
　　　　　　　　　　　　　　　　　　　Hayden G. Hanson
　　　　　　　　　　　　　　　　　　　State Bar No. 24110598
　　　　　　　　　　　　　　　　　　　hhanson@lynnllp.com
　　　　　　　　　　　　　　　　　　　Zhenmian Xu
　　　　　　　　　　　　　　　　　　　State Bar No. 24135820
　　　　　　　　　　　　　　　　　　　sxu@lynnllp.com

　　　　　　　　　　　　　　　　　　　**LYNN PINKER HURST & SCHWEGMANN, LLP**
　　　　　　　　　　　　　　　　　　　2100 Ross Avenue, Suite 2700
　　　　　　　　　　　　　　　　　　　Dallas, TX 75201
　　　　　　　　　　　　　　　　　　　Telephone: 214-981-3800
　　　　　　　　　　　　　　　　　　　Facsimile: 214-981-3839

　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff Endure Industries, Inc.*

## CERTIFICATE OF SERVICE

　　　The undersigned certifies that on August 21, 2024, a copy of the above was served on all parties of record *via CM/ECF*.

　　　　　　　　　　　　　　　　　　　*/s/ Andres Correa*
　　　　　　　　　　　　　　　　　　　Andres Correa